# Richmond.

STARKE AND NORMAN v. BERRY'S EXECUTORS AND OTHERS.

March 16, 1916.

Absent, Keith, P.

1. WILLS — Construction — Parol Evidence of Surrounding Circumstances.—Although the meaning of a testator is to be determined by the language he uses in his will, parol evidence of his surrounding circumstances is always admissible in order to apprise the court as nearly as may be of his situation and viewpont with reference to the persons and things dealt with in his will, and thus aid in determining his true intent.

2. WILLS—Construction—Case in Judgment—"Net Profits"—Percentage of Profits.—A testator, for a number of years before his death, had written contracts with two trusted and "confidential" employees by which he agreed to pay each a certain salary per week, and 7½ per cent. of the net profits of the business. These contracts provided how the annual inventory was to be taken, deducting a percentage for bad debts, and that there should also be deducted interest at six per cent. per annum on the capital invested by the employer in the business before the 7½ per cent. to the employee was calculated; and a contract to this effect was in force with each of said employees at the time of the testator's death. By a codicil to his will, the testator gave to these two employees the option to buy the stock, good-will and fixtures of the business in which they had faithfully served for many years on certain specified terms. Among these terms he provided that for the current fiscal year ending March 1, 1914, the said employees should be allowed "one-half of the net profits of the business for the fiscal year ending at that time, after figuring everything in the usual way." The employees accepted the option, but disagreed with the executor as to the allowance of interest on the capital invested in the business, or, if this was charged, as to the percentage to be credited to them on their purchase.

Held: 1. Interest should be allowed the testator's estate on the capital invested in the business, as had always theretofore been done in the testator's lifetime, and, after deducting the capital, interest, bad debts, and what had usually been deducted in their

annual settlements from the assets of the business ascertained as theretofore, the balance constituted the "net profits" upon which the employees were entitled to receive their percentage.

2. Only one division of profits was contemplated by the testator. Under this, the employees were entitled to receive fifty *per cent.* of the "net profits" "after figuring everything in the usual way." They were not entitled to 7½ *per cent.* of profits under their contracts in addition to the fifty *per cent.* provided for in the codicil.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for complainants. Two of the defendants appeal.

*Affirmed.*

The opinion states the case.

*Leake & Buford* and *Meredith & Cocke,* for the appellants.

*Julian Gunn* and *Coke & Pickrell,* for the appellees.

KELLY, J., delivered the opinion of the court.

The decision of this appeal turns upon the meaning which the late O. H. Berry intended to express by the words "net profits," as used by him in a codicil to his will. The question arises and is to be determined upon the following state of facts and circumstances:

The testator for many years before his death owned and conducted a large and immensely profitable retail clothing and furnishing store for men, under the style of O. H. Berry & Company. Chief among his employees were the appellants, Thos. H. Starke and Chas. T. Norman. For at least eighteen years (1896 to 1914 inclusive) Mr. Berry followed the practice, at the beginning of each fiscal year, of entering into annual employment contracts with each of these employees, whereby he agreed to pay them a fixed salary and, in addition thereto, a certain percentage of the profits of the business. In these con-

tracts Thos. H. Starke was designated as Berry's "confidential salesman and manager," and Chas. T. Norman as his "confidential bookkeeper and assistant. " In the outset of this practice the salary and percentage of the profits allowed to Starke were somewhat larger than Norman's salary and percentage, but, as time went on, increases were made in the case of each until, at the testator's death in 1913, the contracts then in force each provided for exactly the same compensation, to-wit, thirty-five dollars per week in salary, and 7½ *per cent.* in the profits of the business.

It is important to observe the precise terms of the aforesaid contracts in so far as they relate to the profits in which Starke and Norman were to share. The pertinent language in this respect, taken from Starke's contract for the year 1896 and fairly representative of all the others, is as follows: "In addition to the above salary . . . in order to make the said party of the second part more closely identified with the interest and success of the business, the party of the first part agrees to give the party of the second part, in consideration of his services as confidential salesman and manager, five *per cent.* on the net profits of the business for the year . . . It is further understood and agreed by the party of the second part that the party of the first part is to receive six *per cent.* interest on his capital in the business, which amount is to be deducted from the net profits of the business before the five *per cent.* commission is calculated to find the amount due the party of the second part. The party of the first part agrees that the party of the second part is to receive the rate of six *per cent.* interest on any amount he may have to his credit on the books."

While the contracts were not all found, it is in proof and is conceded that during the period above indicated similar contracts were in force for each year from 1896 to 1913. All of the contracts actually produced contained an express provision for a deduction of six *per cent.* interest on the capital invested, except the contract with Norman for 1908, which

was a very brief memorandum providing that in addition to his weekly salary he should receive "five *per cent.* of the net profits in the business of the said O. H. Berry & Co." In this year (1908), however, as in the other years, the books of the firm show that six *per cent.* interest on Berry's capital was deducted in order to determine the amount upon which, as "net profits," Norman was to have five *per cent.* in addition to his salary; and the witness, Miller, an expert accountant employed to examine the books, testifies that Norman explained to him that it was well understood between him and Berry that this six *per cent.* interest was to be deducted as in the other years.

It is desirable to note that while the results of these contracts are shown on the firm's books, they appear under what are known in the record as "blind entries," perfectly intelligible to the parties, but not to others without extrinsic explanation.

On the 27th of June, 1908, the said O. H. Berry executed his will, in which he made numerous and elaborate provisions as to the disposition of his large and varied estate, and by the tenth clause thereof gave certain directions looking to a sale or winding up of the business of O. H. Berry & Co. This tenth clause of the will was changed by a codicil, dated September 18, 1913, the construction of which is the subject of this appeal. The codicil, so far as it need be quoted here is as follows:

"Realizing that I am quite a sick man, I wish and do hereby make this codicil to my last will and testament:

"I have already, in said last will and testament, requested the court to allow my executor and executrix to loan a reasonable sum of money to the business of O. H. Berry & Company, for its continuation until a favorable opportunity for its sale should arise.

"I now wish and do hereby change this, by authorizing and instructing my executor and executrix to loan Mr. Thomas H.

Starke and Mr. Charles T. Norman the sum of one hundred thousand dollars ($100,000.00), for the purpose of buying the said business of O. H. Berry & Company, the said sum to be paid back to my estate at the rate of twenty thousand dollars *per annum,* until the whole amount of said loan is paid.

"It is my will and desire that the business of O. H. Berry & Company shall be sold to the said Thomas H. Starke and Charles T. Norman at dollar for dollar for the ledger accounts, after the usual amount for bad debts has been deducted—and they shall also pay dollar for dollar for all of the stock after an inventory has been carefully taken in the usual way. They shall also pay the sum of ten thousand dollars ($10,000.00) for all the fixtures, appurtenances, signs and everything incident to the business except stock. They are to pay nothing whatever for the good will of the firm, as they have been old and faithful employees and have practically spent their lives with me in the conduct of this business and contributed largely to its success. . . .

"Should I not survive this present sickness, it is my wish and desire that my executor and executrix continue the said business of O. H. Berry & Company until March the first, nineteen hundred and fourteen, so as to wind up the affairs of said business at the end of a fiscal year—and in that case the said Thomas H. Starke and Charles T. Norman will have practically run the business since September, nineteen hundred and thirteen, and I want the court to allow my said executor and executrix, whom I hereby instruct to that effect, to allow the said Starke and Norman one-half of the net profits of the business for the fiscal year ending at that time, after figuring everything in the usual way. The other one-half to be credited to my personal account."

Mr. Berry died October 27, 1913, and shortly thereafter the executors named in the will, having first duly qualified, brought this suit in the Chancery Court of the city of Richmond for a construction of the will on certain points, and to obtain the

guidance and direction of the court in administering the estate. Pending this suit Starke and Norman accepted the option to purchase the business of O. H. Berry & Company.

A number of questions arose and were passed upon, but the appellants complain of the action of the court in only two particulars, and of these only in the alternative, as indicated in their two assignments of error, which, in substance, are as follows:

1st. That the court erred in holding that, "in computing the net profits (for division under the terms of the codicil) the personal account of O. H. Berry shall first be credited by six *per cent.* interest *per annum* on the average amount of his capital invested;" and

2. That the court erred in holding, as it did, that the appellants were not entitled to receive the percentage of net profits provided for in their contracts of employment in addition to the one-half of the net profits mentioned in the codicil.

In respect to the latter contention, the appellants offered in the lower court, and offer here, to waive the same in case they are allowed one-half of the net profits for the year ending February 28, 1914, without any deduction for interest on capital invested. We will dispose of these two assignments in the order named above.

1. It is an old and well-settled rule in the construction of wills that, although the meaning of the testator must be determined by the language he uses, parol evidence of his surrounding circumstances is always admissible in order to apprise the court as nearly as may be of his situation and viewpoint with reference to the persons and things dealt with in the will, and thus aid in determining his true intent. 2 Min. Inst. (4th Ed.), pp. 1060, 1070; *Wootton* v. *Redd's Ex's*, 12 Gratt (53 Va.) 196, 205; 4 Wigmore on Evidence, sec. 2470, cl. 3, p. 3499; *Northrop* v. *Columbian Lumber Co.*, 186 Fed. 770, 776, C. C. A. 640; *Atkinson* v. *Sutton*, 23 W. Va. 197, 200.

In discussing the growth and development of this principle, Professor Wigmore (vol. 4, p. 3499) says: "Once freed from the primitive formalism which views the document as a self-contained and self-operative formula, we can fully appreciate the modern principle that the words of a document are never anything but indices to extrinsic things, and that therefore all the circumstances must be considered which go to make clear the sense of the words—that is, their associations with things. In the field of wills, where there is none but the individual standard of meaning to be considered, this principle is seen in unrestricted operation; and its full sanction has often been judicially avowed."

The extrinsic evidence in this case shows that for years it had been the regular practice of Mr. Berry to have the books balanced at the end of each fiscal year, charging off an estimated amount for bad debts, taking an inventory of the stock on hand, always following in these and other respects the same general methods. The contracts under which Starke and Norman were employed provided for a percentage "of the net profits," but contained a further clause to the effect that interest on capital should be deducted from the net profits before the percentage should be calculated. This was regularly done each year, and would have been done in the year ending March 1, 1914, if Mr. Berry had remained in good health and things had gone on as usual. With this long and uniform course of business necessarily in mind, he provided in his codicil for the "usual amount" for bad debts to be charged off, for the inventory to be taken in the "usual way," and for Starke and Norman to have "one-half of the net profits of the business for the fiscal year *after figuring everything in the usual way."* (Italics added.)

We think it clear that the testator meant that appellants' fifty *per cent.* of the net profits should be figured just as their seven and one-half *per cent.* each would have been figured if there had been no change in the business. In their contracts

he had always *in terms* given them a certain interest in the "net profits," and yet had shown by other language that the "net profits" in which they were to share meant "net profits" less six *per cent.* interest on capital. That was "the usual way" of computing the net profits in which they were to share, and that, in the opinion of the lower court and in our opinion, is what Mr. Berry meant in directing that everything was to be figured in the usual way in arriving at the net profits which were to be equally divided between him and the appellants. In no other way can any reasonable explanation be found for the use of the words "figuring everything in the usual way." This language must mean something, and unless it be regarded as a vain and tautological reference to net profits in the usual technical sense, it can have no other meaning than that which the court below ascribed to it.

If there had been nothing in the contracts and course of dealing between these parties to the contrary, the naked words, "net profits," would have excluded the idea of any deduction of interest in favor of Mr. Berry; but in view of these contracts and this course of dealing, we must conclude that the "net profits," arrived at by "counting everything in the usual way" mean the profits of the business after crediting Berry's personal account, as usual, with six *per cent.* interest on his capital.

We have not overlooked the argument of counsel for appellants, based upon the evident fact that the testator intended to recognize the long and faithful services of these two employees and to compensate them for their increased responsibility consequent upon his illness; but we think this argument is fully met and satisfied by the gift to them of the valuable good will of the business, the loan to them of $100,000.00 on easy terms and without security, the very material increase in their share of the net profits for the year, and the otherwise favorable provisions in the codicil relative to their acquisition of the business.

2. Having reached the conclusion that the first assignment of error cannot be sustained, we are brought to consider the second, which is only insisted upon in case the first is overruled, and which is that the lower court erred in refusing to allow the appellants seven and one-half *per cent.* each in the net profits in addition to the fifty *per cent.* provided for in the codicil.

There is, we think, no satisfactory ground upon which to rest this contention. Indeed, in their original answer in this case, the appellants, affirming the natural if not the irresistible conclusion in the premises, make the following statement: "As hereinbefore implied, these respondents do not claim that under said will they are entitled in addition to said salaries to more than fifty *per cent.* of the net profits of said business for the fiscal year ending March 1, 1914. Whatever doubt, if any, there may be on the subject, they are willing for it to be resolved in favor of the testator's estate, as they are satisfied that it was his intention that they should receive only fifty *per cent.* thereof and their said salaries."

Their explanation of this admission and their attempt to meet and avoid its effect, as embodied in their amended answer, while doubtless made in good faith, falls short of the mark. Their claim in this respect is that when they filed their original answer they had no intimation that the executors would claim the right to deduct interest on Mr. Berry's capital before dividing the profits with them. As a matter of fact, the executors at the outset did not expect to make such a claim, but the reason was that at the outset they did not know that such a deduction had been made in all the previous years. The significance of the "blind entries" on the books and the uniformity and number of the employment contracts showing "the usual way" of computing the amount upon which the percentage of "net profits" was to be counted, had not then been discovered by the executors, although, of course, known all the time by the appellants. There was good reason, therefore, for the execu-

tors to change their position, but none, as we think, for a change of opinion by the appellants. The question is, what did the testator mean? With all the light which they now have as to his meaning, they said they were satisfied it was his intention that they should receive only fifty *per cent.* of the net profits plus their salaries. The fact that after-discovered evidence led the executors to take a different view of the meaning of "net profits" affords no reason for the appellants to change their position as to the testator's meaning upon a wholly different question, viz: the question whether they were to have two distinct allowances from the net profits (regardless of what "net profits" mean).

Independent of the above admission of the appellants, which at the least is very persuasive, the language of the testator plainly shows that he contemplated only one division of the profits, "one-half" to them and "the other half to be credited" to his personal account. It cannot be supposed that the testator had any idea of two divisions of the profits, one to allow the appellants seven and one-half *per cent.* each under their contracts, and the other to allow them a further sum equal to fifty *per cent.* of the remaining profits after deducting the seven and one-half *per cent.* each allowed under the first division.

The decree of the chancery court is, in our opinion, not only remarkably clear and explicit in all its directions to the executors, but is in accord with the apparent intent of the testator, and it must therefore, be affirmed.

*Affirmed.*