## �export𝔦𝔠𝔥𝔪𝔬𝔫𝔡

### H. M. COFFMAN'S ADM'R V. REBECCA S. COFFMAN, ET AL.

#### November 17, 1921.

1. WILLS—*Construction—Extrinsic Evidence.*—Extrinsic evidence cannot be used in aid of the interpretation of a will if the will is plain and unambiguous, for it is not permitted to interpret "that which has no need of interpretation." But in many cases language is to be found in a will which appears to be susceptible of more than one interpretation. In such cases resort may be had to extrinsic evidence, subject to certain reasonably well defined limitations.

2. WILLS—*Construction—Extrinsic Evidence—Material Facts and Circumstances.*—Extrinsic evidence of material facts and circumstances, which concern the testator, his property, his family, the claimant or claimants under the will, and their relations to the testator, is admissible in the case of disputed interpretation.

3. WILLS—*Construction—Extrinsic Evidence—Material Facts and Circumstances.*—The object of interpretation is to ascertain the meaning of the words as used by the testator, what the words represented in his mind, and what he understood to be signified by them. For this purpose it is indispensable that the expositor should know the situation of the testator, the state of his family and property, his relations to persons and things, his opinions and beliefs, his hopes and fears, and his habits of thought and of language. That is to say, the interpreter should identify himself with the testator.

4. WILLS—*Construction—Declarations of Intention by Testator.— "Equivocation."*—There is but one situation in which the judicial expositor has the right to invoke the aid of direct evidence of the testator's actual intention, such as his declarations of intention, his informal memoranda for his will, his instructions for its preparation, and his statements to the scrivener or others as to the meaning of its language; and that is where the words in the will describe well, but equally well, two or more persons or two or more things, and such declarations are offered to show which person or which thing was meant by the testator— *i. e.,* by the words in the will as used by him. This situation has been described as a case of "equivocation."

5. WILLS—*Construction—Extrinsic Evidence—Case at Bar.*—In the instant case, which involved the construction of a will, the widow of the testator claiming the whole estate, subject to the payment of certain legacies, and the heirs and distributees claiming that testator died intestate as to certain of his real and personal property, there was no "equivocation" involved, but there was a use of language which failed to make the testator's meaning altogether clear.

*Held:* That testator's declarations, so far as they purported to describe the intention he meant to express in the will, were inadmissible, but that evidence of facts showing his situation, including in particular the character and value of his property, his family and family relationships, the claimants under the will, and his attitude with reference to them, was admissible for the purpose of determining his probable intent.

6. WILLS—*Construction—Extrinsic Evidence—Facts Should be Clearly and Satisfactorily Established—Case at Bar.*—In a suit involving the construction of a will, where the widow claimed the whole estate, and the heirs and distributees that testator died intestate as to part of his estate, the extrinsic evidence went no further than to show his affection and solicitude for his wife, the number and names and situation of his next of kin, and the amount and kind of his property, and of that owned by the other parties to the litigation, and the opinion of the lower court showed that it considered these facts and circumstances. The failure to consider evidence of testator's ill will for any of his heirs and distributees was not error, where the evidence with respect to them left the court in serious doubt as to whether the testator felt unkindly towards any of them.

7. WILLS—*Construction—Extrinsic Evidence Must Be Satisfactory.*—When the necessity arises to go outside of a will and call in the aid of extrinsic facts, such facts ought to be clearly and satisfactorily established. If the evidence with respect to them leaves the court in serious doubt, they ought not to be relied on.

8. WILLS—*Construction—Presumption Against Partial Intestacy.*—There is a strong presumption against partial intestacy, intensified where the testator has used a general residuary clause, and the courts have for a long time inclined very decidedly against adopting any construction of wills which leaves the testator intestate as to a part of his estate, unless that result is absolutely unescapable.

9. WILLS—*Construction—Life Estate or Fee Simple—Case at Bar.*—A testator gave his wife "my entire interest in the farm that we now live on and all bonds, notes, and money that I possess or may be coming to me as long as she" lives. At her death

he gave two of his wife's nieces $500 each, and then provided that, "the remainder of my effects I leave with my wife to dispose of as she thinks proper." Testator's wife was manifestly the prime object of his bounty, and there was a total omission of any reference to his heirs and distributees.

*Held:* That the will, viewed as a whole, in the light of the facts and circumstances proper to be considered, showed a complete testamentary plan by which testator intended to give everything that he had to his wife, subject only to the two legacies, and that there was no partial intestacy.

10. WILLS—*Construction—Life Estate or Fee Simple—Absolute Power of Disposition.*—The general rule is that, where an estate for life is given in express terms, the language in other parts of the will relied on to enlarge the life estate into an absolute estate ought not to be given such effect unless the language is very clear indeed. Nevertheless, though property is devised or bequeathed to one for life, even in the most express terms, yet if, by other terms in the same instrument, it is manifest that the devisee or legatee is invested with absolute power to dispose of the subject at his will and pleasure, he is not a mere life tenant, but absolute owner.

11. WORDS AND PHRASES—*"Effects"—Wills.*—While the word "effects" may usually be confined to personal property and not extended to realty, yet whether the term includes the one or the other or both species of property must be determined by the context, and by the surrounding circumstances. Thus, where a testator after giving two legacies of $500 each, left the remainer of his effects to his widow to dispose of as she thought proper, the word "effects" is broad enough to carry both real and personal property.

Appeal from a decree of the Circuit Court of Page county construing a will. Decree for heirs and distributees. Administrator appeals.

*Reversed.*

The opinion states the case.

*Geo. N. Conrad,* for the appellant.

*Wm. F. Keyser* and *H. V. Strayer,* for the appellees.

KELLY, P., delivered the opinion of the court.

This suit involves the construction of the will of H. M. Coffman, deceased, which, omitting the formal parts, was as follows:

"I give and bequeath unto my beloved wife, Rebecca S. Coffman, my entire interest in the farm that we now live on and all bonds, notes, and money that I possess or may be coming to me as long as she, Rebecca, lives. After her death I will and bequeath unto Martha M. Zirkle, Maud O. Zirkle, five hundred dollars each, making $1,000 divided between the two of my nieces for living with us and comforting us during our sad bereavement in losing our dear son, the remainder of my effects I leave with my wife to dispose of as she thinks proper."

The controversy in the case is between Mrs. Rebecca S. Coffman, the widow, who claims the whole estate subject to the payment of the two legacies of $500.00 each, and the heirs and distributees of the testator, who claim that he died intestate as to certain of his real and personal property. The lower court sustained the latter claim.

The will was dated May 5, 1900, and the testator died in January 1920. He left no children or descendants, his only child, a son, having died in 1898, but he was survived by his widow, Rebecca S. Coffman, three sisters, Mary A. Coffman, B. Frances Coffman, and Mrs. Martha E. Modesitt, and one brother, David J. Coffman, who were his heirs and distributees.

The testator and his wife were old people. The two unmarried sisters and the brother, a man of unsound mind, were likewise advanced in years, all of them being over seventy years of age. The married sister was considerably younger. The latter with her husband, S. H. Modesitt, owned and resided on a valuable farm which had formerly belonged to her father, and which she had acquired by deed from her brothers and sisters. The two unmarried sisters

and the unmarried brother lived on the same farm, were comfortably situated, and their support was reasonably well provided for.

The testator and his wife had resided for nearly forty years prior to his death on a farm which had been conveyed to them jointly shortly after their marriage. The consideration for that conveyance was $3,205.00, $1,000.00 of which was paid for Mr. Coffman by his mother, $2,000.00 of which was paid for Mrs. Coffman by her father, and the residue of which, $205.00, the grantees perhaps paid jointly. Subsequently Mrs. Coffman, out of money realized from her father's estate, contributed $3,000.00 which went into the place in the way of improvements. Mr. Coffman was a good farmer, and his wife was industrious and frugal. They kept the farm in good condition, continuing to improve it, and that fact, together with the advance in the market price of farming land, made it worth perhaps $20,000.00 at the time of the testator's death. When the will was written the property of the testator consisted of his interest in the farm and of a considerable amount of personal property made up of household furniture, farming implements, live stock, money, notes, bonds, and stock in various corporations. At the time of his death his indebtedness was very small, and the amount of his personal property of every kind had been increased to an aggregate amount of something more than $9,000.00. He had also acquired subsequent to the execution of the will two tracts of mountain land of somewhat uncertain value, but worth perhaps $2,000.00.

Before undertaking to construe the will, we may dispose of a preliminary question raised by one of the assignments of error, and discussed at considerable length in the oral and written arguments in this case. A good deal of testimony was introduced for the purpose of showing that the testator did not want any of his property to go to his

brother and sisters. The evidence relied on for this purpose was of two kinds or classes, first, evidence of a general nature tending to show that he did not feel kindly towards them, and, second, evidence of particular alleged declarations by him that he would exclude them or had excluded them by his will from any share in his estate. Some of this evidence of both classes was objected to, and·some of it was introduced without objection. In rebutal of such evidence, without waiving objection thereto, the heirs produced witnesses who testified to the contrary, some.of them being offered to show that the testator was on good terms with his brother and sisters, and others to show that they had heard him make declarations indicating that he intended his estate to go to his own relations in blood.

[1-4] In a memorandum opinion, the learned judge of the circuit court says: "Declarations of intention, etc., not admissible to aid in the construction of will. Objections of that character sustained." It is contended that the court excluded "all evidence relating to the situation and declared purposes and intentions of the testator in the disposal of his property." We do not understand that the court went this far. It excluded evidence of the testator's declarations of intention, but not evidence of his situation, and this ruling was in accord with the law as applied to the facts of this case. The proper use of extrinsic evidence in aid of the interpretation of wills may be regarded as reasonably well settled. It cannot be used at all if the will is plain and unambiguous, for "it is not permitted to interpret that which has no need of interpretation." But there are many different ways of expressing the same thought; there are many varying shades of meaning which a group of words may have; men differ much in their knowledge of lexicography and grammar, and in their facility of expression; and the necessary result is that in many cases language is to be found in a will which appears to be suscep-

tible of more than one interpretation. In such cases resort may be had to extrinsic evidence, subject to certain reasonably well defined limitations. Professor Charles A. Graves made a valuable contribution to the law on this subject in a paper which he read at the annual meeting of the Virginia State Bar Association in 1893, published in Vol. VI of the Bar Association Reports, page 183 *et seq*; also published in 14 Va. Law Reg. page 913 *et seq*. He divides the extrinsic evidence which may be offered in aid of the interpretation of a will into two classes and says: "Of these the first consists of material facts, and these may concern the testator, his property, his family, the claimant or claimants under the will, their relations to the testator, &c. The second class, on the other hand, is confined to direct evidence of the testator's actual intention, such as his declarations of intention, his informal memoranda for his will, his instructions for its preparation, and his statements to the scrivener or others as to the meaning of its language. And this division of extrinsic evidence not only exists in the nature of the case, but is of the utmost practical importance in the interpretation of wills, as the rules for the admissibility of the two kinds of evidence are not the same. Let us call the first kind *the facts and circumstances,* and use the expression *declaration of intention* to describe all extrinsic statements by the testator as to his actual testamentary intentions—*i. e.,* as to what he has done, or designs to do, by his will, or as to the meaning of its words as used by him."

Having made this classification, Professor Graves proceeds to show that evidence of the first kind, "the facts and circumstances," is always admissible in a case of disputed interpretation, saying: "For the object of interpretation is to ascertain the meaning of the words as used by the testator; what the words represented in his mind; what he understood to be signified by them: and for this purpose it

is indispensable that the expositor should know the situation of the testator; the state of his family and property; his relations to persons and things; his opinions and beliefs; his hopes and fears; his habits of thought and of language; in a word, that the interpreter should identify himself with the testator as to knowledge, feeling, and speech, and thus, scanning the words of the will from the testator's point of view, decide as to their meaning as used by him." In support of this conclusion the learned author cites *Smith* v. *Bell*, 6 Pet. (U. S.) 74, 8 L. Ed. 322; *Colton* v. *Colton*, 127 U. S. 300, 8 Sup. Ct. 1164, 32 L. Ed. 138; *Hatcher* v. *Hatcher*, 80 Va. 169; *Miller* v. *Potterfield*, 86 Va. 876, 11 S. E. 486, 19 Am. St. Rep. 919, to which we may add, from a number of recent Virginia decisions to the same effect, *Stark* v. *Berry*, 118 Va. 706, 711, 88 S. E. 68; *Penick's Ex'r* v. *Walker*, 125 Va. 274, 278, 99 S. E. 559. In the last-named case, we said: "The primary consideration and rule of construction is to determine the intention of the testator from the language which he has used. If the meaning of that language is plain, the will must be given effect accordingly. This rule is familiar and elementary, and to it all others are subordinate and subservient. If there be doubt as to the meaning, then the auxiliary or subordinate rule to be first applied, and the one of most usefulness and importance, is for the court to place itself as nearly as possible in the situation of the testator at the time of the execution of the will."

With reference to the second of the two classes of extrinsic evidence dealt with in the paper by Professor Graves, "testator's declarations of intention," he says: "There is but one situation in which the judicial expositor has the right to invoke the aid of declarations of intention, and that is where the words in the will describe well, but equally well, two or more persons or two or more things, and such declarations are offered to show which person or which

thing was meant by the testator—*i. e.*, by the words in the will as used by him." This situation he describes as a case of "equivocation," and his conclusion with respect thereto, is fortified by citation of authorities, and is followed by a most instructive and interesting discussion and explanation of what will constitute equivocation, and the reasons why the evidence of the testator's declarations as contrasted with evidence of the facts and circumstances surrounding him is so narrowly restricted in its use.

[5] In the instant case there is no "equivocation" involved, but there is a use of language which fails to make the testator's meaning altogether clear, with the result that the widow on the one hand and the heirs and distributees on the other, represented before us by able and reputable counsel, take diametrically opposing views as to what the testator meant by the language which he used. It follows that his declarations so far as they purported to describe the intention he meant to express in the will were inadmissible, but that evidence of facts showing his situation, including in particular the character and value of his property, his family and family relationships, the claimants under the will and his attitude with reference to them, was admissible for the purpose of determining his probable intent. And this, we think, is just what the lower court held. He expressly excluded the declarations, but it is clear that he did not mean to exclude the other class of extrinsic evidence, the facts and circumstances. Indeed, his memorandum opinion necessarily shows that he did consider these facts and circumstances for he specifically states that "the beneficiary of the residuary clause (widow) is manifestly the prime object of the testator's bounty," and that "his two sisters and insane brother (are) already well provided for in life and are advanced in years." These statements are necessarily based upon extrinsic evidence.

[6, 7] Whatever may have been the view of the trial court

however, upon the questions we have discussed, the result in this case is the same. The declarations of intention were properly ruled out, and the balance of the extrinsic evidence when duly appraised and weighed, cannot be held to have gone further than to show his affection and solicitude for his wife, the number and names and situation of his next of kin, and the amount and kind of his property, and of that owned by the other parties to this litigation. As to his alleged ill will for any of his collateral kindred, there was a good deal of evidence on both sides and it is too conflicting to be of value in arriving at his intention. When the necessity arises to go outside of a will and call in the aid of extrinsic facts, such facts ought to be clearly and satisfactorily established. If the evidence with respect to them leaves the court in serious doubt, they ought not to be relied on, and in this case it does leave the court in doubt as to whether the testator felt unkindly towards any of the parties who are here claiming adversely to the widow.

[8, 9] We come now to the interpretation of the will. The circuit court held: 1st, that the widow took a life estate in the testator's interest in the farm, leaving him intestate as to the reversion; 2nd, that the widow also took a life estate in the bonds, notes and money, the remainder in which, after the payment therefrom of the two legacies of $500.00 each to Martha and Maud Zirkle, would go to the testator's distributees, thus leaving him intestate as to such remainder; 3rd, that the corporate stock did not pass under the description of "bonds, notes and money," but went to the widow as "effects" under the residuary clause; and 4th, that the mountain land was not embraced in the term "effects" in the residuary clause, and that as to this land also the testator died intestate.

It must be admitted that there is much to be said in support of each of the holdings above outlined, but upon a careful view of the language of the will as a whole, viewed

30

in the light of the material surrounding facts and circumstances; and of the legal presumption applicable to the case, we have reached the conclusion that as to holdings 1, 2 and 4 above noted the circuit court was in error.

We start out with the legal presumption that the testator intended to dispose of his entire estate. There is a strong presumption against partial intestacy, intensified where, as here, the testator has used a general residuary clause, and the courts have for a long time inclined very decidedly against adopting any construction of wills which leaves the testator intestate as to a part of his estate, unless that result is absolutely unescapable. *Prison Association* v. *Russell*, 103 Va. 563, 576, 49 S. E. 966. It is further to be especially observed that the testator's wife in this case was, as stated by the learned judge below, manifestly the prime object of his bounty. She had contributed largely by her management and frugality, and by the contribution of her own funds, to her husband's success in improving the farm and accumulating other effects. They had lost their only child. His affection for his wife is apparent both from the extrinsic evidence and from the terms of the will itself. No other beneficiary is named in the will except two of her nieces (not his), who had comforted them in the loss of their son, and to whom he gave $500.00 each. His married sister was well off, and his two unmarried sisters and his brother, a man of unsound mind, were well provided for, and were advanced in years. None of these were referred to in the will, either by name or by any general designation.

The dispositive clause of the will contains only two sentences. The first is so phrased and punctuated as to indicate a purpose to give the widow only a life estate in his interest in the farm and in the bonds, notes and money. It is this: "I give and bequeath to my beloved wife, Rebecca S. Coffman, my entire interest in the farm that we now

live on and all bonds, notes, and money that I possess or may be coming to me as long as she, Rebecca, lives." Standing alone, this sentence is perhaps most fairly and naturally to be interpreted as giving only a life estate to the widow in the property therein mentioned, with no provision as to a reversion in any part thereof. There is a contention, however, and we do not think it is altogether without plausibility, that in view of the affection and solicitude of the testator for his wife, and of the history of their ownership and management of the farm, the sentence standing alone might be suspectible of the meaning that the testator was giving to his wife absolutely his "entire interest in the farm," and that the words "as long as she, Rebecca, lives" were intended to place a limitation only upon the bonds, notes and money. Whether this latter view of the sentence standing alone is tenable or not, it seems to us quite clear, when both sentences of the will are construed together, that the testator did mean to give his entire interest in the farm to his wife without limitation, and merely to limit her interest in the money, notes and bonds for the sole and single purpose of designating a fund out of which the two $500.00 legacies were to be paid. The second sentence is as follows: "After her death I will and bequeath unto Martha M. Zirkle, Maud O. Zirkle, five hundred dollars each, making $1,000 divided between the two of my nieces for living with and comforting us during our sad bereavement in losing our dear son, the remainder of my effects I leave with my wife to dispose of as she thinks proper." These two sentences when read together can be harmonized perfectly with what the testator might naturally have been expected to do, and with his total omission of any reference, either specific or general, to his brother and sisters, and can without resort to any strained construction be made to avoid the intestacy which otherwise results, and which we think the testator clearly did not contemplate.

The will, viewed as a whole in the light of the facts and circumstances proper to be considered, shows a complete testamentary plan by which Mr. Coffman intended to give everything he had to his wife, subject only to the requirement that at her death the two legacies should be paid out of the money, notes and bonds.

It is earnestly contended, and much authority is cited in alleged support of the contention, that the limitation to a life estate in the widow by the first sentence is not enlarged to an absolute estate by anything to be found in the second sentence; and, further, that the word "effects" in the residuary clause cannot be made to embrace real estate.

[10] The general rule undoubtedly is that where an estate for life is given in express terms, the language in other parts of the will relied on to enlarge that into an absolute estate ought not to be given such effect unless the language is very clear indeed. See note by Judge E. C. Burks, *Farris* v. *Wayman,* 1st Va. Law Reg., p. 219. This, however, is merely the counterpart of, if not indeed an exception to, the equally well settled rule stated by Judge Burks in the note just cited as follows: "It cannot be doubted that, though property is devised or bequeathed to one for life, even in the most express terms, yet if by other terms in the same instrument it is manifest that the devisee or legatee is invested with absolute power to dispose of the subject at his will and pleasure, he is not a mere life tenant but absolute owner; for there can be no better definition of absolute ownership than absolute dominion." In this case we are not prepared to say that the testator did give a life estate to his wife in express terms. He did it in express terms, of course, if he did it at all, but can we say that the words as used by him cannot fairly be interpreted as expressing an intention on his part to give to his wife his "entire interest in the farm?"

But if it be conceded that the only fair interpretation is

that the language of the first sentence expressly and plainly gave only a life estate in the farm to the widow, then the first rule above mentioned must yield to the second. The will says: "the remainder of my effects I leave with my wife to dispose of as she thinks proper." We think this language in the light of the circumstances, and taken with the context, must be held to express in reasonably clear and natural words just what might have been perhaps more clearly expressed if the will had in more technically correct and accurate language described the entire residue of his estate, both real and personal, in possession and in remainder.

[11] But it is said, and the lower court expressly so held, that the word "effects" does not embrace real estate. We do not take this view of the case. The general rule is that effects means personal property, but that depends on the context, the subject matter and the circumstances. The definition of the word as given in Webster's New International Dictionary is: "Goods; movables; personal estate; as, the people escaped from the town with their *effects*; sometimes used to embrace real as well as personal property."

To illustrate: If we should say, "Mr. A took all of his effects out of his house before it was destroyed by fire," we would, of course, be understood to refer to personal property. On the other hand, if, knowing that Mr. A owned the house in fee simple, we should say, "Mr. A died leaving all of his effects to his wife, except two legacies of $500.00 each to his nieces," we would with equal certainty be understood to mean that the house and its contents would go to the widow, notwithstanding the fact that the house was real estate.

A good many authorities have been cited to show that the word "effects" ordinarily refers to personal property, and these authorities go far enough to hold that the term has

acquired a certain technical meaning of that kind, but none of them in any way impinge upon the further general rule that whether the term includes the one or the other or both species of property must be determined by the context, and by the surrounding circumstances. This will appear from the authorities principally relied upon to support the decree complained of. See, for example, note to *Andrews* v. *Applegate,* 12 L. R. A. (N. S.) 661; 3 Words & Phrases, 2320; 40 Cyc. 1527, and note; Schouler on Wills and Administration, sec. 509, and cases cited. We do not deem it necessary to quote from these authorities, or to multiply, as we might do, citations of others to the same effect. No new question or principle of construction is involved.

We have no doubt that the testator, by the general and sweeping residuary clause, intended to give the widow everything he had, except the thousand dollars given to her nieces; and this we think, under the circumstances, may fairly be said to be the meaning of the words used by him.

This conclusion renders it unnecessary for us to discuss certain other questions which would present themselves if we took a different view of the meaning of the testator's will, including in particular the cross assignment of error filed by the appellees.

For the reasons stated, the decree complained of will be reversed and the cause remanded to the circuit court for further proceedings to be had therein not in conflict with the views herein expressed.

*Reversed.*