# Richmond.

## ELWOOD F. JONES v. E. S. MEEKS.

November 14, 1929.

The opinion states the case.

*Edward Meeks* and *J. T. Coleman, Jr.*, for the appellants.

*Robt. N. Whithead* and *Caskie, Frost & Coleman*, for the appellees.

HOLT, J., delivered the opinion of the court.

The purpose of this suit is to ascertain the proper construction of the will of L. W. Meeks, now dead.

The will itself was written on November 22, 1922. Mr. Meeks died on December 26, following, leaving to survive him a widow but no children. This is the will:

"Massie's Mill, Va., November 22, 1922.

"I, L. W. Meeks, being of sound mind, make this my last will and testament:

"First—I give to my mother, E. A. Meeks, an income for life of one hundred and fifty ($150.00) to be paid annually out of the proceeds of my mill.

"Second—I give my wife, E. S. Meeks, my mill, the water rights, miller's house, mill lot, and the lot below the mill known as the 'big garden' for life and at her death the same to go to my nephew, Elwood F. Jones, he to pay my nephew, John N. Meeks, two thousand dollars ($2,000.00) as his interest in my estate.

"Third—I give to my brother, Peter S. Meeks, my gold watch.

"Fourth—I give to my brother, W. S. Meeks, the grey mare bought of D. K. Hatter.

"Fifth—I give to my brother, M. N. Meeks, ten dollars ($10.00) in cash.

"Sixth—I give all the balance of my money, stocks, bonds, and property, both personal and real, to my wife, E. S. Meeks, in fee simple.

"I appoint my wife, E. S. Meeks, as administratrix of this my last will and request that she be not required to give bond.

"L. W. MEEKS.

"Witnesses:
          "H. E. POWELL
          "R. A. MAHONE."

In 1912, L. W. Meeks, under a contract theretofore, had purchased from the estate of Thornton L. Massie, that property known as Massie's Mill. The land so bought was a tract of sixty or more acres on which was the mill proper. R. S. McNabb, as miller, operated the mill from 1912 until after its owner's death. In 1915 or later Mr. Meeks built himself a well appointed and valuable dwelling on a lot across the fore-bay from the mill proper. We are to determine who takes title thereto under the will.

For convenience, reference is made to an accompanying plat of this mill property.

It was the contention of the plaintiff below, Mrs. E. S. Meeks, wife of decedent, that this dwelling passed to her under the residuary clause in her husband's will, clause six, while the defendants took the position that it passed under the second clause to the wife for life only,

MAP

SHOWING SEVERAL LOTS OF LAND SITUATED AT MASSIES MILL IN NELSON CO. VA.
PLATTED MAY 19 1928 FOR MRS. E. S. MEEKS
SCALED 1"–100'       S. E. SAUNDERS S.N.E.

S. E. S. EXHIBIT No. 1

and at her death to Elwood F. Jones, a nephew—in short, that this residence is on the "mill lot" and passed with it. The trial court held with the plaintiff, and that judgment is before us on appeal.

When decedent acquired this property in 1912, it was all known as Massie's Mill, and so in a general sense all of that property adjacent to the mill proper may readily have been covered by the term "mill lot." We are to ascertain what Meeks intended by the use

of this term ten years later, in 1922, when his will was written, and not what was meant by it at some earlier date.

Certain time-worn canons of construction, repeatedly approved by this court, are to be remembered.

■ "The rule is elementary that the intention of the testator is the polar star which is to guide in the interpretation of all wills, and when ascertained, effect will be given to it unless it violates some rule of law or is contrary to public policy. In ascertaining this intention, the language used and the sense in which it is used by the testator is the primary source of information, as it is the expressed intention of the testator which is sought." *Bare's Executors* v. *Montgomery*, 143 Va. 303, 130 S. E. 230.

■ "It is an old and well settled rule in construction of wills that, although the meaning of the testator must be determined by the language he uses, parol evidence of his surrounding circumstances is always admissible in order to apprise the court, as nearly as may be, of his situation and viewpoint with reference to the persons and things dealt with in the will, and thus aid in determining his true intent." *Everett* v. *First National Bank*, 142 Va. 149, 128 S. E. 450.

■ Accompanying facts and circumstances are always admissible in a case of disputed interpretation. "For the object of interpretation is to ascertain the meaning of the words as used by the testator; what the words represented in his mind; what he understood to be signified by them; and for this purpose it is indispensable that the expositor should know the situation of the testator; the state of his family and property; his relation to persons and things; his opinions and beliefs; his hopes and fears; his habits of thought and of language; in a word, that the interpreter should

identify himself with the testator as to knowledge, feeling, and speech, and thus, scanning the words of the will from the testator's point of view, decide as to their meaning as used by him." Prof. Chas. A. Graves in 14 Va. Law Reg. 913. *Coffman's Adm'r.* v. *Coffman,* ·131 Va. 462, 109 S. E. 454.

Little law is involved. This cause turns upon the evidence and upon the language of the will itself.

E. F. Bowling has testified. He knew Mr. Meeks and worked for him, and was employed to move a garage from the house lot. Meeks told him to put it on, the "mill lot," and indicated the place on that lot where he wished it located. This was about twelve months before the testator died. He further testified that the "mill lot," as shown upon the accompanying plat, is that lot and contains 0.84 acres. It was originally fenced in but part of the fence was torn down for a tramway up the race and while a part of the fence is now gone its old location can be plainly seen. The fore-bay itself served as a fence on its southeastern line.

E. S. Saunders, county surveyor of Nelson county, made the plat in evidence. The buildings shown on it are correctly located but the boundary lines are as pointed out to him by the miller, Mr. McNabb. There is no real controversy as to their correctness. The house lot is as it appears upon that map. Conceding its location to be correctly shown, the defendant's contention is that it is still a part of the "mill lot."

O. P. Carter, a justice of the peace, said that the house lot was enclosed. As a matter of fact, there is only a fence around it on the southeast line and on the southwest line where they run along the county road. There is no fence to the northeast, but it is there bounded by the waste race which runs in a deep depression, and on the northwest is bounded by the fore-

bay, an elevated structure which carries water to the mill. He said that people were in the habit of tying their horses to the fence around this dwelling, and in 1919–20 he heard Meeks say: "The damn Tye riverians must think this is the mill lot; take your damn plugs around in the mill lot." On this house lot were certain inconsiderable outbuildings which Meeks removed. It may be noted here in passing that in 1915 the testator platted a considerable part of the Massie's Mill property across the fore-bay from the mill itself and sold thirty-three of the lots shown on it, some of which were bought by this witness. One of the lots on this plat is that on which the dwelling now is. In other words, that lot was at that time cut off by testator from the mill lot proper. Its northwestern line ran parallel with the fore-bay and ten feet from it, which would indicate that Mr. Meeks left this ten foot strip across the fore-bay from the mill as a part of the mill lot that it might be used whenever repairs to the fore-bay were necessary.

Reuben Vaughan cut wood, killed hogs and stacked feed for Mr. Meeks, who told him to stack the feed "in the mill lot back of the mill." He also told him "to kill the hogs in back of the mill lot between the fore-bay and the hill." He was likewise told to cut the wood in the mill lot and pitch it across the fore-bay because he did not want any chips in his yard.

R. S. McNabb was miller for Meeks from the date of his purchase. He pointed out to the surveyor the lines as shown upon his plat and said that the lines of the lots are as they there appear. He too heard Mr. Meeks tell those who hitched their horses to the fence to take them around to the "mill lot" and asked them if they could not see his signs there stuck up. Witness has full control of the mill lot proper but of no other property.

H. B. Parrish also testified about the horses being taken over to the mill lot and about the sign on the fence. Mr. Meeks told this witness "that he had a lot around there at the mill which he called the mill lot and that there was plenty of room there for hitching purposes." J. P. Lea testified to the same general effect.

Mrs. Meeks, the widow, said that she had frequently heard her husband refer to the lot around the mill as the "mill lot" and had never heard him so designate that upon which the dwelling was located. She also said that when the will was first read its contents were not discussed; that she did not then take them in though some one told her what they were. She denied that she was then told that the residence went to Elwood Jones or that she at that time expressed satisfaction with any such provision. She did say that any disposition which her husband had made of his property was satisfactory to her. She had been told that all of the real estate went to Jones and did not take in the situation until the will was taken to the county clerk for probate.

For the defendants, R. W. Massie testifying said that he was familiar with this property and once owned it, but that he had not lived in the neighborhood for the past thirty years; that from his knwoledge of it he was of opinion that the dwelling is on what is commonly known as the "mill lot," but that he had no knowledge of how the testator, himself, had designated the lots into which this property was afterwards divided.

Mrs. Annette Jones, mother of Elwood, said that she heard Mrs. Meeks say when the will was read that she knew her husband thought a great deal of Elwood and was glad he had left the dwelling to him. Her only

request being that he would never sell it to the Leas, and that she expressed herself as satisfied with all that had been done.

Howard Greiner lived near Massie's Mill. He had never heard the lot on which the residence is situated called anything but the mill lot, but he had never heard testator make any statement as to what he thought was included in that designation.

Waller Carter, a negro of seventy-four years, had known this property all of his life, and had never heard the land on which the residence is called anything but the mill lot. To the same effect is the evidence of John P. Hatter.

Sylvanus Meeks, a brother of the testator and Jones' uncle, said that the mill lot included the residence; that Mrs. Meeks was satisfied with the will when first read and made but one request which was that Elwood would not sell this home to the Leas. L. N. Miller had known this property for forty-four years and understood that the residence was on the mill lot.

G. C. Jones, father of Elwood, said that he too was acquainted with the property and that the residence lot was part of the mill lot and had never heard it called anything else. He also testified to the expressions of satisfaction made by the widow when the will was first read and that she said: "I am glad that Leon (Mr. Meeks) left his property to Elwood and that she was glad that Elwood got the house; and there was one request she wanted to make of Elwood and that was that he would never let the Leas have it."

Peter I. Meeks, a brother of the testator, heard him say that he expected to build a home on the mill lot where he could be close to the mill, and the testator

always spoke of the residence lot as the mill lot. He was asked on cross-examination:

"Q. When he told you to clean off the ground in front of his house and between it and the Tye River road, did he tell you to clean off the mill lot?

"A. Yes, sir.

"Q. Do you mean to say that your brother referred to his front yard as the mill lot?

"A. Yes, sir."

Elwood F. Jones, the defendant, has also testified. He said decedent, on the 20th of November, 1922, had sent for him, and said: "I had a conversation with him. He told me that he did not think he would live long and that he was going to give me this property here (the dwelling) when he finished with it, and he told me that if he were not better in a few days to come back and see him, that he wanted to talk with me further."

R. L. Hughes said that he knew this property well, and had worked there at times when Mr. Meeks was present, and that he never heard the house lot called anything but the mill lot. Before Meeks' purchase Mr. Tom Massie said to him: "Do not build anything on that lot, it belongs to mother; that is the mill lot and I only have it rented." That was before the division—before Mrs. Massie died.

The widow, in rebuttal, denied having made those statements attributed to her as having been made when the will was first read.

■■ This is the substance of the testimony: That introduced on behalf of the defendants falls into two classes. The first deals with conditions before Meeks' purchase, as for example the testimony of R. W. Massie, a one-time owner. To it we cannot attach much weight for clearly in old days what was known as Massie's Mill included all of the property there situated and

owned by the Massies. Since that time the situation has changed. After the testator took possession he certainly cut off from the mill that portion of land lying across the fore-bay, as is shown by this plat made in 1915. This house lot was not there treated as a part of the mill lot, but as separate from it, and was offered for sale so separated to any possible purchaser. That of the second class definitely places the dwelling, after it was built, on what was still known as the "mill lot." Between these witnesses and those who have testified for the plaintiff there is irreconcilable conflict. In such a situation, the judgment of the trial court is presumed to be right, and the burden is upon those who question it to show error. *C. E. Wright & Co.* v. *Shackleford*, 152 Va. 635, 148 S. E. 807, 809. This rule has added force from the fact that the learned trial judge had a life-long knowledge of the situation. Error on his part has not been shown.

Our conclusion is strengthened by the language of the will itself. Testator in its second clause goes into detail in stating what Elwood F. Jones was to take. He took "my mill, the water rights, miller's house, mill lot and the lot below the mill, known as the 'big garden.' " We cannot readily believe that he would have failed in this detailed tabulation to mention the dwelling had he intended that it be included. Relatively speaking, it was very valuable, certainly more valuable than any other single piece of property owned by him, unless it be the mill proper. It was not appurtenant to the mill nor necessary in its operation. The miller did not live there, and since it is not appurtenant it does not fall, as defendants insist, within the rule laid down in *Gilbert* v. *McCreary*, 87 W. Va. 56, 104 S. E. 273, 12 A. L. R. 1172. The rule there stated might successfully be invoked if title to the miller's

house was in controversy. It cannot apply to the dwelling as a primary proposition, which had no connection with the mill beyond the fact that its owner lived there.

We are of opinion that the dwelling passed in fee to the widow as part of the real estate given her in clause 6, and that there is no error in the decree appealed from.

*Affirmed.*