# Wytheville

## CORA B. SWAN V. SWAN'S EXECUTOR, ET AL.

### June 14, 1923.

1. WILLS—*Construction—Primary Rules—Intention—Plain Language.*—The primary consideration and rule of construction is to determine the intention of the testator from the language which he has used. If the meaning of his language is plain, the will must be given effect accordingly. This rule is familiar and elementary, and to it all others are subordinate and subservient.

2. WILLS—*Construction—Supposed Intention.*—The intention of the testator must be derived from what the testator has actually said, and not from what it may be supposed he intended to say.

3. WILLS—*Construction—Intention—What the Words as Used by Testator Mean.*—It is not the meaning of the words in the abstract that control, nor the meaning of the writer apart from his words. The language of the testator must control, but the final inquiry is what the words as used by him mean.

4. INTERPRETATION AND CONSTRUCTION—*Intention—General Scope of the Instrument—Surrounding Circumstances.*—Whether construing a deed or a will, the object is to discover the intention, which is to be gathered in every case from the general purpose and scope of the instrument in the light of the surrounding circumstances.

5. ANNUITY—*Annuity as Debt—Annuity Provided for by Separation Agreement.*—Where, under a valid separation agreement, testator had agreed to pay his divorced wife an annuity for her life, such annuity is a debt within the meaning of a clause in testator's will providing for the payment of his just debts.

6. WILLS—*Construction—Intention of Testator—Election—Case at Bar.*—A testator under a separation agreement was obliged to pay his former wife an annuity of $2,000.00, and under the agreement the former wife was to have a life estate in their residence. Testator gave a bond with a trust company as surety to secure the performance of this agreement and deposited with that company as indemnity securities to the value of $10,000.00. Testator in his will provided that all of his just debts should be paid, and devised to his divorced wife their former residence in fee simple and gave her the $10,000.00 in the trust company. The divorced wife claimed the annuity under

the separation agreement and also the benefit of the provisions of the will.

*Held:* That in the light of the testator's situation and surroundings, and the general plan which he had in mind in making the will, he did not intend to include the annuity among his debts, but designed to satisfy that claim by the gift in the will, and the divorced wife was properly required to elect.

7. WILLS—*Legacies—Satisfaction of Legacy.*—The general rule is that a legacy given by a debtor to his creditor equal to or greater than the debt is, in the absence of proof of a contrary intention, deemed to be a satisfaction of the debt.

8. ELECTION—*Equitable Election.*—Equitable election imposes an obligation upon a party to choose between two inconsistent or alternative rights or claims in cases where there is a clear intention of the person from whom he derives one that he should not enjoy both. The test is the intention of the donor.

9. STOCK AND STOCKHOLDERS—*Assignment of Certificate of Stock—Title of Assignee.*—Where the owner of a certificate of stock assigned it to another, and two years later the certificate was surrendered and a new certificate issued in the name of the assignee for a like amount, this method of transfer vested the legal title in the assignee and constituted her, *prima facie*, the real owner, in the absence of proof to the contrary.

10. STOCK AND STOCKHOLDERS—*Assignment of Certificate of Stock—Title of Assignee—Certificate as Evidence of Ownership.*—A certificate of stock, though *prima facie* evidence of ownership in the person to whom it has been issued, possesses no such magic or sacredness as to prevent an inquiry into the facts. Sometimes the transferee is merely a nominal holder or "dummy," and in that event, although the transfer may be perfectly regular and complete on its face, the true ownership remains in the transferor, and that fact may be shown.

11. STOCK AND STOCKHOLDERS—*Gift of Stock—Husband and Wife—Case at Bar.*—In the instant case, a contest between an executor and the wife of deceased as to the ownership of a certificate of stock, although the transfer of the certificate from the husband to the wife was regular and complete, the evidence was convincing that the wife was never anything but a nominal holder and never had any real interest in or control over the stock which was transferred to her. The husband had for years used the certificate as his own, listed it as one of the assets of his estate, received the dividends on it, voted it in his own name at the corporate meetings, and finally made a will whereby he clearly attempted to dispose of it.

*Held:* That as there was no valid gift of the stock by the husband to the wife, it passed to the executor under the terms of the will.

12. GIFTS—*Tests of Valid Gifts Inter Vivos—Gifts of Certificates of Stock.*— The tests of a valid gift *inter vivos* are: (1) An intention at the time

to make a gift; and (2) such actual or constructive delivery as divests the donor of all dominion and control over the subject and invests the donee therewith. And this applies to certificates of stock owned by the alleged donor but issued in the name of the alleged donee.

Appeal from a decree of the Chancery Court of the city of Richmond construing a will.

*Affirmed in part; reversed in part.*

The opinion states the case.

*E. C. Massie* and *C. H. Smith,* for the appellant.

*Daniel Grinnan, Pollard & Smith, Jere J. Crowley, Henley, Hall, Hall & Peachy,* and *Bull, Roberts & Hart,* for the appellees.

KELLY, P., delivered the opinion of the court.

The ultimate questions to be decided in this controversy must be determined, either wholly or in large part, by a construction of the will of Lewis H. Swan, deceased. Before coming to these questions it seems essential to make a somewhat lengthy statement of facts leading up to the situation of the testator and the objects of his bounty at the time he made the will, and of certain other facts developing after his death which throw light upon his testamentary scheme.

Lewis H. Swan was married in 1887 to Cora Bennett. For some years after their marriage these parties resided at North Tonawanda, New York, where they occupied a home known as 120 Payne avenue. The title to this property, subject to a mortgage for $2,500.00, was in the name of Cora B. Swan, but Lewis E. Swan was the real owner.

In 1907, Swan came to Norfolk and bought a business enterprise known as the Berkley Box and Lumber Company, which, at his instance, was incorporated in June, 1908, with a capital of $25,000.00, represented by 250 shares of stock, 238 of which were issued in Swan's name and the remaining twelve to persons connected with the business in a subordinate capacity. Subsequently he acquired eleven of the latter shares.

In the fall of 1908, Mrs. Swan, who had continued to reside in North Tonawanda, moved to Norfolk to live with her husband; but the climate did not agree with her, and, moreover, she was rendered very unhappy by the discovery of her husband's infatuation for Mrs. Josephine V. Hayward, wife of Horace Hayward, a salesman employed by the Berkley Box and Lumber Company. This marks the beginning of a domestic unhappiness which later resulted in two divorces hereinafter referred to. In the spring of 1909, Mr. Swan took Mrs. Swan back to Tonawanda, remained with her there for a short time, and then returned to Norfolk. They did not thereafter live together as husband and wife, but he continued to contribute to her support until about the time of his divorce from her, when they entered into the separation agreement presently to be set forth.

This couple had no children, and they practically adopted a little girl named Mae Swan, a niece of Mr. Swan, who came to them when she was two or three years old and made her home with them as one of the family until 1906, when she was married to a man named White.

In the summer of 1911, Swan brought suit against his wife for divorce on the ground of desertion. She was personally served with process, but made no defense, and a decree granting him a divorce *a mensa* was ren-

dered in September, 1911, which on May 24, 1912, was converted into a decree for divorce from the bonds of matrimony.

Just prior to the last mentioned decree, and manifestly in contemplation thereof, to-wit, on April 30, 1912, a deed or agreement of separation was executed by and between Lewis H. and Cora B. Swan, wherein and whereby, after reciting their marriage in 1887, their separation since 1909, his desire to make provision for her permanent support as long as she might live and not remarry, and the desire of both parties to settle all property rights, it was agreed as follows:

1. That he should pay her $2,500 in cash.

2. That he should pay her $166.67 a month, with interest on any deferred payment, as long as she should live and remain unmarried; his whole estate being charged therewith.

3. That he should secure said payments by a $10,000 bond with the Fidelity Trust Company of Baltimore as surety; and should make a will charging said payments on his whole estate.

4. That he should pay off the $2,500.00 mortgage on the home known as No. 120 Payne avenue, in North Tonawanda, N. Y., the title to which stood in her name.

5. That she should retain all personal property in her possession, including household and kitchen furniture in said home.

6. That she should convey No. 120 Payne avenue to such person as he might direct, reserving to herself a life estate therein; and should unite with him in conveying No. 232 Goundry street to Berkley Box and Lumber Company, Inc.

7. That she should pay all taxes and levies on No. 120 Payne avenue.

8. That she released her dower rights and should

unite in any deed he might require for that purpose; and likewise released her rights in $22,500.00 of insurance policies taken out on his life for her benefit.

9. That this contract should be construed according to the laws of Virginia.

Swan paid the $2,500.00 provided for in the first clause of the foregoing agreement, and complied with the third clause by executing a bond for $10,000.00 with the Fidelity and Deposit Company of Maryland as surety, depositing with that company, as indemnity, securities of the value of $10,000.00. He also afterwards paid off and discharged the $2,500.00 mortgage on the Tonawanda home, as required by the fourth clause; and he paid the annuity provided for in the second clause in full up to the time of his death.

Mrs. Cora B. Swan did not remarry, and she survived Mr. Swan.

Mrs. Josephine V. Hayward obtained a divorce from Horace Hayward December 5, 1910, the expenses of the suit being borne by L. H. Swan, and on June 12, 1912, she and Swan were married.

One of the principal questions in this case is as to the present ownership of 138 shares of stock in the Berkley Box and Lumber Company formerly owned by Swan, and now claimed on the one hand by Josephine V. Swan, and on the other hand by the executor under the will of Lewis H. Swan; and it is in order at this point to set out the history of that stock up to the time of his death.

On January 15, 1909, L. H. Swan sold to George Lamphier sixty-two and one-half of his 283 shares of this stock, and on that date Certificate No. 6 was issued to Swan for the remainder, to-wit: 175½ shares. Lamphier then became, and thereafter until Swan's death remained, the secretary and treasurer of the company.

The following endorsement appears on the back of Certificate No. 6, to-wit: "For value received_____ hereby sell, assign and transfer unto Mrs. J. V. Hay-ward (175) shares of the capital stock represented by the within certificate, and do hereby irrevocably consti-tute and appoint Geo. G. Lamphier, agt. to transfer the said stock on the books of the above named corpo-ration with full power of substitution in the premises." This endorsement was dated January 25, 1910, was signed by "Lewis H. Swan," and purported to be signed in the presence of "Elias Brener." The identity of Brener is not disclosed.

The date of this assignment, it will be observed, was prior to either Mr. Swan's or Mrs. Hayward's divorce. The evidence justifies the statement that there was no valid consideration for the assignment.

On January 20, 1912, Swan exchanged Certificate No. 6 of 175½ shares for Certificate No. 12 of a like number, the latter being issued in the name of Mrs. J. V. Hay-ward. She was then divorced from her husband, but Swan had not yet obtained an absolute divorce from his wife. On the stub of the stock book from which Certificate No. 12 was taken there was pasted a slip of paper on which was written: "Rec'd Jany 20, 1912, of the Berkley Box and Lumber Company, Inc., Certifi-cate No. 12 for 175½ shares stock." This paper was in the handwriting of L. H. Swan, and subscribed thereto was the name "Mrs. J. V. Hayward," but it does not clearly appear whether this signature was affixed by her or by him.

Mrs. J. V. Swan testified in this case that Swan "pre-sented" her with this certificate in Norfolk in February, 1912, which was about a month after its issue, and about four months before her marriage to Swan. The commissioner who took the account and filed a very

-elaborate report in this case says, with reference to her alleged receipt for Certificate No. 12: "While the evidence is silent upon the subject, the inference is too clear for dispute that the then Mrs. Hayward signed this bit of paper away from the office of the corporation, and that it was thereafter brought to the office and pasted on the stub of Certificate No. 12 in the certificate book."

On January 15, 1913, Mrs. Josephine V. Swan executed to her husband the following power of attorney:

"Know all men by these presents, That I, Mrs. L. H. Swan, of Norfolk, Va., do hereby constitute and appoint L. H. Swan my lawful proxy, for me and in my name, place and stead, to vote as my proxy at the annual meeting of the stockholders of The Berkley Box and Lumber Company, Inc., *for the election of directors*, to be held at its office on Friday, the 17th day of January, 1913, *and at all future meetings* of stockholders which shall be held *for a similar purpose*, until this authority shall be revoked, according to the number of votes I should be entitled to vote if then personally present." (Italics added.)   This was a continuing proxy unless and until revoked, but it was for a limited purpose, and it was apparently never used except at the one meeting to which it specifically referred.   It was in the handwriting of L. H. Swan, was signed by Mrs. L. H. Swan "in the presence of L. H. Swan."   On January 17, 1913 (one day before the record date of the surrender of Certificate No. 12 and the issuance of Certificate No. 13 for the 138 shares in controversy), an annual meeting of the corporation was held, and at that time the minute book of the corporation shows the following stockholders as present:

"L. H. Swan, representing_____11 shares

"L. H. Swan, holding proxy of Mrs.

    J. V. Haywood of_____175½ shares

"Geo. G. Lamphier, representing_____62½ shares.

"Geo. M. Wonycott_____1 share."

On January 18, 1913, Stock Certificate No. 12 for 175½ shares then standing in the name of Mrs. J. V. Hayward was surrendered, and in place thereof two certificates were issued, to-wit: Certificate No. 13 for 138 shares in the name of Mrs. L. H. Swan and Certificate No. 14 for thirty-seven and one-half shares in the name of Geo. G. Lamphier. Certificate No. 13 was receipted for on the stub of the stock book in the handwriting of L. H. Swan as follows: "Received this certificate. Mrs. L. H. Swan by L. H. S."

It was discovered after the death of L. H. Swan that on the original Certificate No. 13 the letter "s" of the prefix "Mrs." had been erased, so that the face of the certificate indicated that it had been issued to Mr. L. H. Swan" instead of "Mrs. L. H. Swan." This erasure is not explained, but the clear inference is that Swan, who always did as he pleased with the stock, made the change himself.

It will be observed that Mrs. J. V. Hayward did not appear as a stockholder on the record books of the corporation until January 20, 1912. Prior to that date, although Swan's assignment had been endorsed on the back of Certificate No. 6 as of January 25, 1910, he was the holder of record of all the shares of stock voted by him at the several stockholders' meetings. The manner in which the stock was subsequently voted is material. The minute book shows that with the exception of the above mentioned annual meeting of January 17, 1913, the name of L. H. Swan appears on the minutes as the holder of 149 shares of stock which included the eleven shares standing on the books in his.

name as well as the 138 shares in the name of Mrs. L. H. Swan. These facts are specifically set forth in the following statement taken from the commissioner's report, and copied by him from the evidence:

"Date of Meeting.            Recital        p. of Deps.
"24th Feb. 1914   'L. H. Swan, holding 149
                  shares                    60, 61
"15th Jan. 1915   'L. H. Swan, 149 shares       62
"21st Jan. 1916   'L. H. Swan, 149 shares       63
"19th Jan. 1917   'L. H. Swan, 149 shares       64
"18th Jan. 1918   'L. H. Swan, 149 shares       64
"28th Oct. 1918   'L. H. Swan, proxy, 149
                  shares                       66
    "Mem.   At above meeting it appears that Geo.
      G. Lamphier acted as proxy for L. H. Swan.
"17th Jan. 1919.  'L. H. Swan, 149 shares       67
"4th Apr. 1919.   'Amer. Trust Co., executor of
                  L. H. Swan, 149 shares       70."

Mr. Geo. G. Lamphier, testifying to an inquiry as to the facts appearing in the statement last set out, said: "It simply appears that the issuance of this stock to Mrs. J. V. Hayward, and subsequently to Mrs. L. H. Swan, has been completely overlooked and ignored in all our meetings. Mr. Swan has voted that stock at all meetings and taken dividends on it."

Mrs. Swan testified that in the latter part of January, 1913, her husband returned to her a certificate for 138 shares, and she undertakes to account for its custody in such a manner as to make it appear that it was thereafter actually or constructively in her possession until her husband's death. We cannot undertake to detail the evidence in this case, and will content ourselves at this point by saying that upon the whole it seems clear that she did not have the exclusive possession of this stock, or any substantial control over it.

Mr. Swan died on the 21st day of March, 1919, and thereafter, on the 29th of March, 1919, the American Trust Company, sole executor named in the will, had the same admitted to probate in the Chancery Court of the city of Richmond, and qualified as executor.

In the latter part of March, 1919, Mr. Geo. C. Gregory, trust officer of the American Trust Company, wrote to Mrs. L. H. Swan, requesting her to come to Richmond and consult with him about the estate, and requested that she bring the key to his safety-deposit box.   She did come to Richmond early in April, but it was found that there were no papers of value belonging to the estate in the bank vault.   Later Mrs. Swan brought to Mr. Gregory's office a paper box containing papers belonging to her husband as well as to her, and these papers were examined by Mr. Gregory in the presence of Mrs. Swan, and he at that time made a list of the papers which he regarded as belonging to the estate and gave her a receipt for the same.   In that receipt Certificate No. 13 for 138 shares was specifically listed in the name of "Mr. L. H. Swan" and as belonging to the estate, the erasure of the letter "s" from the prefix "Mrs." not then having been discovered. Mrs. Swan did not say anything about any claim on her part to this certificate or the stock represented by it, and, furthermore, she delivered to Mr. Gregory at that time a statement which had recently been prepared by L. H. Swan showing the assets which he claimed to own at the time of making the statement, and including the 138 shares of stock.

Subsequently the executor, deeming it wise to sell the stock of the Berkley Box and Lumber Company, wrote Mrs. Swan in reference thereto, and everything in the correspondence between the executor and Mrs. Swan indicates that both parties looked on this stock as be--

longing to the estate, and she never intimated the slightest claim on her part thereto. In August, 1919, solely for the purpose of arriving at a correct valuation of the stock of the Berkley Box and Lumber Company, the executor employed a special accountant to make an examination of the books of the company, and in the course of this examination the accountant discovered that the stub of Certificate No. 13 showed that it had been issued to "Mrs. L. H. Swan," and he reported this fact to the executor, who was greatly surprised. The executor then took the matter up with Mrs. Swan, called her attention to this discovery, and asked her to sign a transfer or release which would confirm the executor's title. The letter addressed to her for this purpose contained this statement:

"As we may have some trouble transferring this stock, in case we should sell it, and as I am satisfied, from Mr. Swan's attitude regarding this stock and from statements from Mr. Lamphier and yourself, that all this stock belonged to the estate of Mr. L. H. Swan at the time of his death, I am enclosing you herewith an assignment of this stock, which you will please sign and return to me, for the purpose of clearing the record as to this particular certificate."

Mrs. Swan, in reply to the foregoing letter, wrote Mr. Gregory as follows:

"I found your letter waiting for me upon my return from my little vacation. Yes, I remember very well Mr. Swan giving or turning over to me in 1913 stock in the Berkley Box and Lumber Company. I had really forgotten about it, as he took it to the mill for safekeeping. A few weeks before he passed away, he spoke about giving me some stock, as it was always his desire to protect me. Will you please be so kind as to let me know more about it. * * I am getting low

of funds.    Would it be possible for you to send a check: soon, or say every month?''

Other correspondence passed between Mrs. Swan and the executor, and on September 22, 1919, she wrote Mr. Gregory: ''In regards to the stock, will let you know in a few days.''    On October 31, 1919, he wrote her again, after she had made a special trip to Richmond to consult him about the matter, saying; ''Would be glad to hear from you at once as to whether or not you are going to make claim for the stock of the Berkley Box and Lumber Company, because if you make this claim it will be necessary for you to employ special counsel to represent you in this case.''    Shortly thereafter she notified Mr. Gregory that she had engaged counsel, and from that time on she has asserted her claim to the 138 shares of stock, as well as to its proportionate share in the surplus funds of the company now represented by 526 shares of preferred stock, which was issued to the executor under the following circumstances: Sometime prior to the death of Mr. Swan, towit, on January 21, 1916, the Berkley Box and Lumber Company had a large surplus fund which amounted to the sum of $60,000.00, and at a meeting of the stockholders held on that date it was determined that the title to the said surplus fund was vested in the following persons: ''L. H. Swan, $52,631.00, Geo. S. Lamphier,. $7,369.00.''    Mrs. Swan's name does not appear in connection with this matter, and Swan was regularly paid (in addition to regular very large dividends on the stock), interest on this surplus at the rate of six per cent. per annum.    A short time after his death it was deemed expedient by his executor and by Mr. Lamphier, to distribute this surplus, and an amendment of the charter was procured so as to authorize a distribution of the fund in the form of preferred stock..

Such an amendment was effected, *the executor voting 149 shares of common stock* (138 plus eleven shares understood by all parties to belong to Swan's estate), at a stockholders' meeting held on May 10, 1919, for the purpose of authorizing the amendment. Pursuant to authority of this amendment, the corporation issued to "American Trust Company, executor of L. H. Swan, deceased," a certificate for 526 shares of preferred stock in exchange for his interest in the surplus fund aforesaid.

The will of L. H. Swan was as follows:

"I, L. H. Swan, of Richmond, Virginia, being of sound and disposing mind, do hereby make, publish and declare this to be my last will and testament, hereby revoking all wills by me at any time heretofore made.

"First: I desire all my just debts to be paid.

"Second: I give and bequeath the sum of $2,000.00 to my sister, Mrs. Lewella Fergeson, of Elkhart, Indiana, if she be living at the time of my death.

"Third: I give and bequeath the sum of $1,000.00 to my brother, William Swan, of South Bend, Indiana, if he be living at the time of my death.

"Fourth: I give and bequeath the sum of $1,000.00 to my brother, Landon Swan, of Saginaw, Michigan, if he be living at the time of my death.

"Fifth: I give and bequeath all my tangible personal property with the exception of that referred to in the sixth section hereof, to my wife, Josephine V. Swan.

"Sixth: I give, devise and bequeath my home in North Tonawanda, New York, together with all the contents thereof, and the $10,000.00, in the Fidelity Trust Company of Baltimore, Maryland, to Cora B. Swan, in fee simple and absolutely.

"Seventh: All the rest and residue of my estate, real and personal, I give, devise and bequeath to my trustee hereinafter named, in trust, for the following purposes:

"(a) To pay all the net income from two-thirds thereof to my wife, Josephine V. Swan, for life, subject to this provision, however; that if the annual net income from said two-thirds shall ever be less than $5,000.00, my said trustee shall pay to my said wife sufficient of the principal of said two-thirds to make up the difference between the amount of the net income and $5,000.00.

"(b) Upon the death of my said wife, to divide the net income from said two-thirds equally among Robert Emmett Doyle and the children of my niece, Mrs. John K. White, of Buffalo, New York, until her youngest then living child shall have attained the age of twenty-one years.

"(c) After the death of my said wife and when the youngest then living child of my said niece shall have attained the age of twenty-one years, to divide the principal of said two-thirds of the trust estate equally among the said Robert Doyle and the children of my said niece.

"(d) To pay all the net income from the remaining one-third of the trust estate to my niece, Mrs. John K. White, of Buffalo, New York, for life, subject to this provision, however; that if the annual net income from said one-third shall ever be less than $2,500.00, my said trustee shall pay to my said niece sufficient of the principal of said one-third to make up the difference between the amount of the net income and $2,500.00.

"(e) Upon the death of my said niece, to divide the net income from said one-third equally among the children of my said niece, until her youngest then living child shall have attained the age of twenty-one years.

"(f) After the death of my said niece and when her youngest then living child shall have attained the age

of twenty-one years, to divide the principal of said remaining one-third of the trust estate equally among the children of my said niece.

"(g) Should the said Robert Doyle or any of his children of my said niece die before receiving his, her or their full portion or portions of the trust estate, his, her or their portion or portions or parts thereof not received shall be held for and paid over to the survivors or survivor of them, in the manner hereinabove provided.

"Eighth: I appoint the American Trust Company of Richmond, Virginia, my executor and my trustee to carry out the trust provisions in this my last will and testament.

"And I authorize and empower my said executor and trustee, or my executor or trustee, in its discretion, to close out all my business interests as quickly as judicious, to rent and care for my real estate, and from time to time sell and convey my property, real and personal, and invest the proceeds thereof in bonds and railroad stocks; and no purchaser from either my executor or my trustee shall be required to see to the application of the purchase money.

"Given under my hand and seal this 18th day of November, 1917.

"Lewis H. Swan.    (Seal.)"

It is conceded by all the parties concerned that the reference in the sixth clause of the will to the Fidelity Trust Company of Baltimore was an error, and that the testator intended to name the Fidelity and Deposit Company of Maryland.

The present suit was brought by Mrs. Cora B. Swan for a construction of the will and a settlement of the estate. She asks that the executor be required to ac-

count to her for the annuity of $2,000.00 a year provided in the second clause of the separation agreement, and also claims the benefit of the sixth clause of the will. This dual claim on her part is contested by Mrs. Mae Swan White and by Mrs. J. V. Swan. And Mrs. J. V. Swan is asserting herein the ownership of 138 shares of the stock of the Berkley Box and Lumber Company. Mrs. White and Mrs. Cora B. Swan both contest this claim.

The cause was referred to E. M. Long, one of the commissioners in chancery, and he filed and returned a lengthy but very clear and able report, in which he found, first, that Mrs. J. V. Swan was not entitled to the stock represented by Certificate No. 13, but that the same belonged to the estate and should be disposed of and accounted for by the executor; and, second, that the testator intended the sixth clause of the will to be a satisfaction and performance of the separation agreement, and that Mrs. Cora B. Swan could not have the benefit of both instruments, but must elect between the separation agreement and the provision in the will.

Various exceptions were taken to this report, and when the cause came on to be finally heard, the learned judge of the chancery court overruled the exceptions as to the contention of Mrs. Cora B. Swan, and held that she must take an election; but as to the claim of Mrs. J. V. Swan the exceptions were sustained, and the court directed the executor to account to her for the value of the stock represented by Certificate No. 13 for 138 shares. It is from that decree that this appeal was allowed.

1. Our views are in accound with the commissioner and the court as to Mrs. Cora B. Swan's claim. The will, it is true, is unambiguous in its terms, but Mrs. C. B. Swan is asserting an independent claim which is

in conflict with the manifest intention and plan of the testator when the will is read in the light of the separation agreement. In the petition upon which this appeal was granted her counsel very truly and properly say that "it would be folly to undertake to interpret the will without taking into consideration all of the circumstances leading up to its execution." It is true that this language was used by counsel in emphasizing an alleged repentance by Mr. Swan for having become estranged from his first wife, and an alleged change of heart on his part and return of affection toward her in his latter years, but as to this alleged attitude on his part the evidence is not convincing, and the principle of construction invoked in the quotation above may be more appropriately and helpfully applied with respect to the condition of his estate when he made the will.

[1] The rules as to the use which the expositor may make of the testator's situation in construing his will are reasonably well settled. In *Penick's Ex'r* v. *Walker*, 125 Va. 274, 278, 99 S. E. 559, 560, we said: "The primary consideration and rule of construction is to determine the intention of the testator from the language which he has used. If the meaning of his language is plain, the will must be given effect accordingly. This rule is familiar and elementary, and to it all others are subordinate and subservient."

[2] Another general and well settled rule is that the intention must be derived from what the testator has actually said, and not from what it may be supposed he intended to say. *Wootton* v. *Redd's Ex'r*, 12 Gratt. (53 Va.) 196; *Burke* v. *Lee*, 76 Va. 386.

[3] But these rules must not be given, and the courts have been careful not to give them, a too literal and inflexible application. The language of the testator must control, but the final inquiry is what the words *as*

*used by him* mean. *Coffman's Adm'r* v. *Coffman*, 131 Va. 463, 109 S. E. 454; Graves' Address, 6 Va. State Bar Asso. Rep. 183. We cannot better express the thought here than by adopting the language used by Professor Graves in the learned address just cited as follows: "What is it that the judicial expositor seeks to ascertain—is it the meaning of the words or the meaning of the writer? The question is frequently put in this way, as if the disjunction were complete, and the answer must be either the one or the other. We answer, neither. Not the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer. It is not the meaning of the words in the abstract, for the meaning of words varies with the circumstances under which they are used; and not the meaning of the writer apart from his words, for the question is one of interpretation, and what the writer meant to have said, but did not, is foreign to the inquiry; and *voluit sed non dixit* is the law's epitaph on a will which thus fails of its purpose. We must seek the meaning of the writer, but we must find it in his words; and we must seek the meaning of the words, but it must be the meaning of his words—of the words as he has used them—the meaning which they have 'in the mouth of this party,' to use the language of C. B. Eyre. *Gibson* v. *Minet*, 1 N. Bl. 615. For, as has been well said by Wigram (Ext. Evid., Pl. 105), 'Courts of law recognize that natural dependence which exists between language and the circumstances with reference to which it is used, and which makes a knowledge of such circumstances necessary to a right interpretation of the language.' "

So also in Schouler on Wills and Administration (5th ed.), page 758, section 579, it is said:

"* * But to aid the context of the instrument by

extrinsic proof of the circumstances and situation of the testator when it was executed, is constantly permitted at the court's discretion, and this constitutes a proper, indeed, often an indispensable, matter of inquiry when construing a will. For, whatever a will may set forth on its face, its application is to persons and things external; and hence is admitted evidence outside the instrument of facts and circumstances which have any tendency to give effect and operation to the terms of the will; such as the names, descriptions, and designation of beneficiaries named in the will, the relation they occupied to the testator, whether the testator was married or single, and who were his family, what was the state of his property when he made his will and when he died, and other like collateral circumstances. Such evidence being explanatory and incidental is admitted, not for the purpose of introducing new words or a new intention into the will, but so as to give an intelligent construction to the words actually used, consistent· with the real state of the testator's family and property; in short, so as to enable the court to stand in the testator's place, and read it in the light of those surroundings under which it was written and executed."

[4] The same principle, in language peculiarly applicable here, is thus expressed in *Lindsey* v. *Eckels*, 99 Va. 668, 671, 40 S. E. 23, 24, as follows: "Whether construing a deed or will, the object is to discover the intention, which is to be gathered in every case from the general purpose and scope of the instrument in the light of the surrounding circumstances."

[5, 6] There are two clauses of Mr. Swan's will which must be construed in passing upon Mrs. Cora B. Swan's contention, and they are as follows:

"First: I desire all my just debts to be paid."

"Sixth: I give, devise and bequeath my home in

North Tonawanda, New York, together with all the contents thereof, and the $10,000.00 in the Fidelity Trust Company of Baltimore, Maryland, to Cora B. Swan, in fee simple and absolutely.''

The language of these two clauses is clear and unambiguous, and if taken literally, without regard to the testator's situation with respect to his estate, his attitude toward and his relationship with his beneficiaries, and the general scheme of the will as a whole, there could be no doubt that Mrs. Cora B. Swan ought to prevail. Her claim under the deed of settlement was a just debt which in a literal view of the will would have to be paid. And the gift in the sixth clause under such a view would likewise have to be given full effect.

But it seems clear to us that when these two provisions are considered in the light of the testator's situation and surroundings and the general plan which he had in mind in making his will, as disclosed by its various provisions, he did not intend to include the annuity among his debts, but designed to satisfy that claim by the gift in the sixth clause.

[7, 8] Two very closely related principles are involved in the determination of this question, (1) the general rule that a legacy given by a debtor to his creditor equal to or greater than the debt is, in the absence of proof of a contrary intention, deemed to be a satisfaction of the debt (*Stewart* v. *Conrad's Adm'r*, 100 Va. 128, 135, 40 S. E. 624); and (2) the principle of equitable election whereby an obligation is imposed upon a party to choose between two inconsistent or alternative rights or claims in cases where there is a clear intention of the person from whom he derives one that he should not enjoy both. (*Allison* v. *Allison*, 99 Va. 472, 476, 39 S. E. 130.) The former rule is said not to be generally favored by the courts, but both are fixed and settled

principles, and will be enforced whenever necessary to effectuate the donor's intention. Mr. Pomeroy prefers to rest the doctrine of equitable election on the maxim that "he who seeks equity must do equity." 1 Pom. Eq. Jur. (2d ed.), sec. 465. The distinction is perhaps not very important, but the generally recognized test seems to be the intention of the donor. Bisp. Pr. Eq. sec. 295; Story's Eq. Jur., sec. 1075; 11 Am. & Eng. Ency. L. (2d ed.), p. 59. And this is the test as recognized in Virginia. *Rutherford* v. *Mayo,* 76 Va. 117, 124-5; *Allison* v. *Allison, supra.*

In this case the commissioner and the trial court were of the opinion that the testator did not intend Mrs. Cora B. Swan to have both the annuity and the property bequeathed and devised by the sixth clause of the will. The commissioner seems rather to have stressed the testator's intent to make the sixth clause a satisfaction or performance of the annuity contract, while the court required an election because there was a conflict between the contract and the will. Both reasons are sound, and both are in effect the same. The sixth clause was manifestly intended as a substitute for the annuity contract, and the two are plainly in conflict. The following considerations, briefly stated, but elaborated in the commissioner's report and fully sustained by the evidence, seem to us to lead inevitably to this conclusion:

(a) Only a short time prior to the date of the will Swan was endeavoring to bring about a cancellation of the annuity contract. (b) No provision was made in the will which can fairly be construed as a recognition of this obligation. The expressed desire for the payment of all his debts, while broad enough to cover it, was a formal and general expression, and would hardly have been used by him to describe the obligation in question

which, if intended to be preserved and recognized by
him in its original form, would have been a charge on
the whole estate, and of indeterminate amount.    (c)
Mr. Swan was an alert, sagacious and successful busi-
ness man, and the evidence leaves no room to
doubt that, as his estate stood at the time the will was
made and when he died, if Mrs. Cora B. Swan was to
have the gift to her of the properties mentioned in the
sixth clause of the will and also the annuity of $2,000
a year for her life, then the annuities and other pro-
visions set up in the seventh clause of the will, and to
which he expressly dedicated "all the rest and resi-
due" of his estate, would necessarily be to a very
large extent defeated.    (d) In the sixth clause of the
will he gave her the remainder in fee in the Tonawanda
home (reserved to him in the contract) and also the
securities theretofore deposited with the Fidelity and
Deposit Company of Maryland merely for the purpose
of indemnifying that company against loss on account
of their guarantee of his performance of the contract.

In view of these considerations, we fully concur with
the commissioner and the court in the conclusion that
the testator intended the sixth clause of the will as a
satisfaction and performance of the contract for the
annuity, that the provisions of the will and the con-
tract are inconsistent and cannot both be claimed by
the appellant, and that she must elect which she will
take.

2. As to the claim of Mrs. Josephine C. Swan, we are
of opinion that the court erred in sustaining the excep-
tion to the commissioner's report.

[9] It is true that Mr. Swan, in making the transfer
to her, followed the method which is recognized as legal
and regular for the purpose of passing title to shares of
stock from one owner to another.    He first assigned to

her Certificate No. 6 for 175½ shares, and two years later that certificate was surrendered and a new certificate, No. 12, was issued in her name for a like amount. This was exactly the right way to pass title to her. 1 Cook on Corporations (4th ed.), sec. 375. This method of transfer vested the legal title in her and constituted her, *prima facie,* the real owner. In the absence of proof to the contrary, she would thereby become the owner of the stock and could successfully stand on her right to the same against attacks from any source. In such a situation, the case of *Roberts' Appeal,* 85 Pa. St. 84, so confidently relied on by counsel for Mrs. J. V. Swan, would apply.

[10] But it is quite possible and often happens, for reasons of convenience or otherwise, that stock held in the name of one person really belongs to another. In such a case the certificate, though *prima facie* evidence of ownership in the person to whom it has been issued, possesses no such magic or sacredness as to prevent an inquiry into the facts. Sometimes the transferee is merely a nominal holder or "dummy," and in that event, although the transfer may be perfectly regular and complete on its fact, the true ownership remains in the transferor, and that fact may be shown. 1 Cook on Corporations (4th ed.), sec. 263; *Id.,* sec. 421.

[11] The evidence, we think, is convincing that Mrs. J. V. Swan was never anything but a nominal holder and never had any real interest in or control over the stock which was transferred to her.

We are now concerned only with the title to 138 shares, but to correctly decide the question involved we must consider the history of these shares from the beginning. They were a part of the 175½ shares assigned by Lewis H. Swan to Josephine V. Swan in January, 1910, and transferred to her name on the books

of the company in January, 1912. Swan was at both of these dates entangled with her and in trouble with his then wife, Cora B. Swan. At the latter date he had not secured an absolute divorce from his wife, nor had he made with her the separation agreement whereby his liability to her was fixed. The assignment in 1910, though reciting a valuable consideration, must be regarded as voluntary. This, we think, is a necessary inference from the evidence. Mrs. Hayward was wholly unable to pay for the stock. She could not even pay for the expense of her divorce suit, which was defrayed by Mr. Swan. The commissioner in his report says that this assignment "is an enigma unexplained by the evidence," and that it does not appear "whether this certificate (No. 6) was then or thereafter delivered to Mrs. Hayward." As to the surrender of Certificate No. 6 and its reissue as Certificate No. 12 to Mrs. Hayward, it seems clear that she really understood very little about the matter, and merely signed a receipt for the certificate which Mr. Swan carried to the company's office and pasted on the corresponding stub of the stock book. She testified that in February, 1912, "Mr. Swan presented to me Stock Certificate No. 12 for 175½ shares of stock. He presented that to me at Norfolk, Va.," and she also testified that this certificate remained in her possession until January, 1913, when she let him have it so that he might sell thirty-seven and one-half shares to Mr. Lamphier. But it is manifest from the evidence that her possession of that certificate was likewise his possession, and that neither she nor he nor anybody else connected with him in the business ever considered that she was the owner of it. With the single exception of the meeting of January 13, 1913, at which he voted the stock as her proxy, it was always voted in his name, and every corporate action and every entry

on the corporation books showed that the stock was his. Its surplus earnings were set apart to his credit; all the dividends on the stock were paid to him; and Mr. Lamphier testified the transfer to her had been "completely overlooked and ignored." It was undoubtedly he who erased the letter "s" so as to make the face of the certificate read in favor of "*Mr.* L. H. Swan." This was an irregular and improper way to change the record of ownership, but it does not follow that Swan thought he was doing anything more than he had the right to do, so far as Mrs. Swan was concerned. He may or may not have told her about the change, for it would have made very little impression on her. She never had any but a nominal interest. This is manifest from the fact that after his death she, like the executor, failed to notice that there had been an erasure and unquestioningly surrendered the certificate as a part of her husband's estate and took a receipt therefore which in express terms listed the certificate in his name.

Shortly before Mr. Swan's death he included this stock in a statement of his assets. Mrs. Swan delivered this statement, and also the certificate itself, to the executor as a part of the estate, and made no claim to it for several months after her husband's death. Her present claim is utterly inconsistent with the manner in which she and her husband dealt with the stock, and equally inconsistent with her own conduct in dealing with the executor.

Then, when we come to the provisions of Mr. Swan's will, we find conclusive proof that he did not understand that he had given this stock to his second wife. Her claim, like that of Cora B. Swan, would, if sustained, in very large measure, break up the perfectly plain general testamentary scheme. As conclusively

shown by the facts reported by the commissioner, "it is hardly possible to believe that he would have imagined that his estate, minus the additional 138 shares, would produce an income in any way comparable to that directed to be paid to his beneficiaries."

[12] For the reasons indicated, we are of opinion that there was no valid gift *inter vivos* of the stock to Mrs. J. V. Swan, and that it passed by the will to the executor. Her claim fails to meet the tests of a valid gift *inter vivos,* which are (1) an intention at the time to make a gift, and (2) such actual or constructive delivery as divests the donor of all dominion and control over the subject and invests the donee therewith. *Spooner's Adm'r* v. *Hilbish's Ex'r,* 92 Va. 333, 341, *et seq.,* 23 S. E. 751; *Jackson* v. *Twenty-third St. Ry. Co.,* 88 N. Y. 520. And this applies to certificates of stock owned by the alleged donor but issued in the name of the alleged donee. *Getchell* v. *Biddeford Savings Bank,* 94 Me. 452, 47 Atl. 395, 80 Am. St. Rep. 408, 409.

The case of *Bank* v. *Holland,* 99 Va. 495, 39 S. E. 126, 55 L. R. A. 155, 86 Am. St. Rep. 898, relied upon by counsel for Mrs. J. V. Swan, does not support her contention. In that case there was direct and convincing proof of an intention to make the gift, accompanied by a transfer of actual and exclusive possession to the wife. Indeed, the commissioner in this case shows that *Bank* v. *Holland* may very plausibly be relied upon to sustain the executor's claim to the stock. We quote the following from the report:

"Assuming that Certificate No. 13, for 138 shares of stock, was delivered to her by her husband, in February, 1912, it was so delivered without any intention on his part to give the stock to her; and he never did and never intended to divest himself of the control and dominion over the stock represented by this certificate.

Or, on the other hand, assuming that he did deliver the certificate to Mrs. J. V. Haywood, in February, 1912 (she did not become the wife of L. H. Swan until June, 1912), and further assuming that such delivery was with intention to give, on the part of the donor, then your commissioner (for reasons hereinafter stated) is of opinion that this stock was subsequently acquired by L. H. Swan, by delivery and as a gift, from his wife, even though she did not sign the instrument of assignment on the back of the certificate. This was unnecessary to constitute a valid gift. 'The delivery of a certificate of stock, unindorsed, by the donor to the donee, with intent to transfer title by way of gift, is effectual as an equitable assignment. * * A delivery which vests an equitable title only in the donee is all that is required to constitute a valid gift. *First Nat. Bank* v. *Holland*, 99 Va. 495, 39 S. E. 126, 55 L. R. A. 155, 86 Am. St. Rep. 898.' "

We do not think it necessary to hold that Mrs. J. V. Swan gave the stock back to her husband, for it was never hers to give; but there is as much reason to say that she gave it back to him as to say that he gave it to her in the first instance.

We have not undertaken to review the large number of authorities to which counsel for the various parties have referred in their arguments and briefs. Any such review would be either very unsatisfactory and inadequate, or would run this opinion to unreasonable length. The clear and able brief of counsel for Mrs. J. V. Swan has this to say with respect to the decisions dealing with gifts *inter vivos:* "Perhaps in no branch of the law are there as many seemingly irreconcilable decisions as there are in the reported cases dealing with gifts *inter vivos*. This is due in no small degree to the various classes of personal property which may be the

subject of gifts, as well as the different methods in which the legal title may be transferred, and the cases therefore vary according to the character of the thing given and the manner in which title thereto can be passed. If a clear understanding is to be had these distinctions are to be always borne in mind.''

This statement is correct as far as it goes, but in the main the controlling principles are well settled, and the apparently conflicting results are due not only to the reasons stated by counsel, but to the fact that after all, regardless of the class of property or the usual and regular method of transferring title thereto, every case must be decided upon its own facts, and in order to establish a gift *inter vivos* the facts must always be such as to show both intent and delivery. For example, *In re Roberts' Appeal, supra,* as in the instant case, the subject consisted of stock certificates which had been placed in the name of the alleged donee by the alleged donor, but in other respects there are vital differences between the two cases. There was no will in the *Roberts Case,* and the contest was in substance merely one between the administrator and the record owner of the stock. Except for the fact that the donee did not know that the stock had been issued to her and that the donor had not actually delivered the certificates to her, there was nothing to negative the *prima facie* presumption that he intended this regular and legal transfer of title to pass the ownership to her, and the court very properly held that actual delivery in such a case was not necessary. There is nothing in the opinion in the *Roberts Case* to indicate that the Pennsylvania court would have held that there had been a gift of the stock if the alleged donor had for years used it as his own, listed it as one of the assets of his estate, received the dividends on it, voted it in his own name at the cor-

porate meetings, and finally made a will whereby he clearly attempted to dispose of it.   The lack of any such circumstances distinguishes the *Roberts Case* from the case in hand.

The decree appealed from will be affirmed, except as to so much thereof as holds that Mrs. Josephine V. Swan was the true and lawful owner of 138 shares of the stock of the Berkley Box and Lumber Company, and entitled to have the executor account to her therefor. In that particular the decree will be reversed, and the cause remanded for further proceedings to be had not in conflict with the views herein expressed.

The appellees, Mae Swan White, Jane White and Lenore White, and the American Trust Company, executor, as the parties substantially prevailing, will recover their costs on this appeal, the amount of such costs to be decreed jointly against Cora B. Swan and Josephine V. Swan.

*Affirmed in part; reversed in part.*