# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## JEFF WIDGEON, ET ALS. V. DAVID CROCKETT WIDGEON, ET ALS.

### June 10, 1926.

1. WILLS—*Construction—Extrinsic Evidence—Declarations of Intention— Declarations Showing Situation of Testator.*—Declarations of a testator showing his circumstances, property, family, and his attitude towards. claimants upon his bounty are admissible to aid in the construction of a will; but declarations of intention, *i. e.*, as to what testator has done or designs to do by his will, or as to the meaning of its words as used by him, are inadmissible.

2. WILLS—*Construction—Devise to a Son and if he Should Marry "to all Children Lawfully Borned Unto Him"—Case at Bar.*—In the instant case one of testator's sons, Severn, had made a "forced marriage" and shortly afterwards his wife bore a son, David. Severn refused to live with his wife, and she obtained a divorce and remarried. At the time of testator's death Severn had not remarried but did so afterwards. Testator gave Severn a farm for life "and should he marry I give and devise this property to all children lawfully borned unto him." To his other children the devises were for life and at their deaths to "their children." By another clause of his will testator gave other property to his son Severn with remainder to his children. The testator had declared that he did not believe David to be the son of Severn.

   *Held:* That David was not excluded. The only condition prescribed by the testator was that he should be the lawful son of Severn, which being born in wedlock, of course he was.

3. WILLS—*Construction—Shall be Begotten.*—The words "which shall be begotten," annexed to the description of children or issue, do not confine the devise to future children; but the description will, notwithstanding these words, include the children or issue in existence before the making of the will.

4. WILLS—*Children—First and Second Marriage.*—The word "children" *prima facie* includes children by a first and second marriage, and even where there was an express reference to a present or future husband, children by a first or second husband were not excluded.

5. WILLS—*Construction—Intention.*—The primary consideration and rule

of construction is to determine the intention of the testator from the language which he has used. If the meaning of that language is plain, the will must be given effect accordingly. This rule is familiar and elementary, and to it all others are subordinate and subservient. If there be doubt as to the meaning, then the auxiliary or subordinate rule to be applied, and the one of most usefulness and importance, is for the court to place itself as nearly as possible in the situation of the testator at the time of the execution of the will.

Appeal from a decree of the Circuit Court of Northampton county. Decree for defendants. Complainants appeal.

*Affirmed.*

The opinion states the case.

*John E. Nottingham, Jr.,* and *Benjamin T. Gunter,* for the appellants.

*James E. Heath, B. D. Ayres* and *Geo. L. Doughty, Jr.,* for the appellees.

CHINN, J., delivered the opinion of the court.

This suit involves the construction of the will of Thomas Widgeon, which is dated October 13, 1902, and was admitted to probate on November 13th of the same year.

At the date of the will testator had four daughters and three sons, namely: Rebecca, Mollie, Jefferson, Severn, Lucy, John, and Lillie. Of these, Rebecca, Mollie, Jefferson and Lillie were married, and had living offspring. John and Lucy were also married, but had no children born to them until after the testator's death.

Severn Widgeon, the other of testator's seven children, was differently situated. It appears that on

September 19, 1893, this son entered into what is termed a "forced marriage" with a young girl of the county, and shortly thereafter a son, David Crockett Widgeon, was born to them.  Severn Widgeon refused to live with his wife after the said marriage, and, on October 24, 1896, she obtained a divorce from him on the ground of desertion, and was also awarded the custody of the child.  The wife subsequently remarried, but at the time of testator's death Severn Widgeon had not married again.  Briefly stated, such was the situation of testator's children, so far as the same is pertinent to the question involved, at the time the will under consideration was executed.

The will contains eleven separate provisions.  The *first clause* makes provision for testator's wife.  In the *second clause* testator loaned to his daughter, Rebecca, certain real estate during her natural life, and at her death devised the same "to her children."  In the *third clause* he loaned to his daughter, Mollie, a certain farm during her natural life, and at her death devised the same "to her children."  In the *fourth clause* testator loaned his son, Jefferson, a certain farm during his natural life, and at his death devised the same "to his children."  In the *sixth clause*, testator loaned to his daughter, Lucy, a certain farm during her natural life, and at her death devised same "to her children."  In the *seventh clause*, testator loaned his son, John, a certain house and lot during his natural life, and at his death, devised said property "to his children."  In the *eighth clause*, testator loaned to his daughter, Lillie, certain land and buildings during her natural life, and at her death devised the same "to her children."  The *tenth clause* loans testator's granddaughter, Lucy A. Widgeon, certain real estate, and at her death devises same "to her lawful heirs."  The

*eleventh clause* appoints testator's sons, Jefferson, Severn and John, as his executors.

The *fifth and ninth clauses* of the will read as follows:

"5th. I loan to my son Severn the farm where I now live commencing at the railing on the west side of the yard where George Gregory now lives and running south to the land of M. T. Wilson except the house and lot where John Widgeon now lives the store house and house and lot where F. L. Holland now lives during his natural life and should he marry I give and devise this property to all children lawfully borned unto him. The remainder of this farm I will hereinafter devise."

"9th. I loan to my sons, Jeff, Severn and John their natural lives and at their deaths give and devise to their children the balance of my property near Salem church. This property is south and west of the property I have heretofore loaned to my daughter Mollie."

After the death of the testator, Severn Widgeon married Mrs. Linda Wilkins, and died, intestate, on December 23, 1923, leaving his widow, Mrs. Linda Widgeon, surviving him, but no children were born to him by this marriage. After the death of Severn Widgeon the children and certain grand-children of the testator, Thomas Widgeon, instituted this suit against David Crockett Widgeon, and certain parties to whom he had conveyed an undivided interest in the real estate devised by the fifth clause of the aforesaid will, to have said will construed and the land partitioned among all the children and grand-children of Thomas Widgeon, excepting David Crockett Widgeon, contending that under a proper construction of said will, David Crockett Widgeon and his alienees have no interest in said real estate. The court decided against this contention, and thereupon entered a

decree carrying its decision into effect, and ordering that the bill be dismissed; from which decree this appeal was granted.

It seems to have been agreed that the value of the tract of land devised under the ninth clause of the will is $5,000.00; and the value of the property passing under the fifth clause, the title to which is involved in this controversy, is from $30,000.00 to $35,000.00.

[1] The plaintiffs offered in evidence the depositions of John Widgeon and Jeff Widgeon, sons of the testator; of Charles Sterling, his son-in-law; and of W. D. Stoakley, a friend and neighbor of the testator; who testified to the effect that they had frequently heard testator express himself as doubtful whether David Crockett Widgeon was the son of Severn Widgeon, and that he did not intend that said David Crockett Widgeon should have any part of his property.

This evidence was objected to by the defendants in the court below, and it is assigned as error that the court sustained the objection and refused to consider said evidence.

The record does not, however, seem to exactly bear out this statement. The decree construing the will brings the cause on to be heard on the depositions as well as the pleadings, and then expressly declares "that so much of the depositions above mentioned as discloses the circumstances and attitude of mind of the testator, Thomas Widgeon, toward the defendant, David Crockett Widgeon, should be admitted in evidence and considered by the court; but that so much thereof as merely states the declarations of said testator as to his intentions should be excluded and stricken out." We think this ruling of the court was correct.

In the case of *Coffman's Admr.* v. *Coffman,* 131 Va.

456, 109 S. E. 454, where practically the same conten-
tion was made in the appellate court, Judge Kelly, in
delivering the opinion of the court, said:

"It is contended that the court excluded 'all evidence
relating to the situation and declared purposes of the
testator in the disposal of his property.'  We do not
understand that the court went this far.  It excluded
evidence of the testator's declarations of intention,
and the ruling was in accord with the law as applied
to the facts of this case."  The learned judge then
goes on to quote with approval from Professor Graves'
valuable paper on the subject, in which the distin-
guished author, says Judge Kelly, "divides the ex-
trinsic evidence which may be offered in aid of the
interpretation of a will into two classes and says:
'Of these the first consists of material facts, and these
may concern the testator, his property, his family,
and the claimant or claimants under the will, their
relations to the testator, etc.  The second class, on
the other hand, is confined to direct evidence of the
testator's actual intention, such as his declarations of
intention, his informal memoranda for his will, his
instructions for its preparation, and his statements
to the scrivener or others as to the meaning of its
language.  *  *  *  *  *  Let us call the first kind
*the facts and circumstances*, and use the expression
*declaration of intention* to describe all extrinsic state-
ments by the testator as to his actual testamentary
intentions—*i. e.*, as to what he has done, or designs
to do, by his will, or as to the meaning of its words
as used by him.' "

"With reference to the second of the two classes of
extrinsic evidence dealt with in the paper by Professor
Graves, 'testator's declarations of intentions,' he says:
'There is but one situation in which the judicial

expositor has the right to invoke the aid of declarations of intention, and that is where the words in the will describe well, but equally well, two or more persons or two or more things, and such declarations are offered to show which person or which thing was meant by the testator—*i. e.,* by the words in the will as used by him.' "

No such situation, which Professor Graves describes as a case of "equivocation," having arisen in the case now before us, it is clear that we must exclude from consideration, as did the learned judge of the lower court, all the extrinsic evidence appearing in the record which is defined by Professor Graves as "testator's declarations of intentions."

[2] Coming to the construction of the will, it is first contended by appellants that, leaving out of consideration the surrounding circumstances as shown by the extrinsic evidence, the language of the will itself, "should he marry I give and devise this property to all children lawfully borned unto him," shows the intention of the testator to exclude David Crockett Widgeon and to confine the devise over to the lawfully born children of the future marriage only. If Severn Widgeon had not been married before the will was executed, and not had a son by that marriage, this construction would necessarily be applicable, but since it is not questioned that David Crockett Widgeon is the lawfully born son of the life tenant, Severn Widgeon, and that the testator knew of the existence of that son at the time he made the will, leaving out of view for the time being the evidence as to the testator's attitude towards this grandson, we do not think this construction can be placed upon the language of the will. There does not seem to be any adjudged cases in Virginia involving this precise question, but

in 2 Jarman on Wills (Bigelow's 6th ed.), page 192, the rule on the subject is laid down as follows:

[3] "It has been decided, too, that the words 'which shall be begotten,' annexed to the description of children or issue, do not *confine* the devise to future children; but that the description will, notwithstanding these words, include the children or issue in existence before the making of the will(e).

"This doctrine is so old as the time of Lord Coke, who says (f): That as *procreatis* shall extend to the issues begotten *afterwards*, so *procreandis* shall extend to the issues begotten *before*. And in *Almack* v. *Horn* (g) (1 H. & M. 630), where the testator devised real estate to his daughter A, a widow, and his granddaughter B, and the survivor for life, remainder to all the children of A and B lawfully to be begotten as tenants in common in tail; B was the only child of A; but notwithstanding this and the future import of the expression 'to be begotten,' it was held by Sir W. P. Wood, V.-C., that she was entitled with her own children to share in the remainder; the correct view in his opinion being that the expression had no reference at all to time, but merely pointed out the stirps." And the above named author goes on to cite other cases illustrating the rule. See also to same effect *Colemans* v. *Holladay*, 6 Munf. (20 Va.) 47; *Boyce* v. *Wasbrough* (L. R. 1922), 1 App. Cas. 425.

[4] The word "children" *prima facie* includes children by a first and second marriage, and even where there was an express reference to a present or future husband, children by a first or second husband were not excluded. *Barrington* v. *Tristram*, 6 Ves. 345; *Crickett* v. *Taynton*, 1 R. & M. 54; *Andrews* v. *Andrews*, 15 L. R. Ir. 199; *Pasmore* v. *Huggins*, 21 B. 103; *In re Pickup's Will*, 1 J. & H. 389.

It might also be said that aside from the above fixed rule of construction we think that the use of the word "*all*" in the devise under consideration is of itself sufficient to show that the testator intended to include the previously lawfully born children of Severn Widgeon, as well as those that might be thereafter lawfully born of a second marriage, and as David Crockett Widgeon is conceded, as before stated, to be a lawfully born child, he is necessarily included in the devise of the remainder, by the express terms of the will.

It is next contended that the words "should he marry" makes the devise of the remainder contingent upon the second marriage of Severn, and, since it cannot be supposed that the testator intended to make recognition of David Crockett Widgeon "dependent upon a future marriage of Severn," the will exhibits the intention to not recognize him at all.

In *Penick's Ex.* v. *Walker,* 125 Va. 274, 99 S. E. 559, the court said:

[5] "The primary consideration and rule of construction is to determine the intention of the testator from the language which he has used. If the meaning of that language is plain, the will must be given effect accordingly. This rule is familiar and elementary, and to it all others are subordinate and subservient. If there be doubt as to the meaning, then the auxiliary or subordinate rule to be applied, and the one of most usefulness and importance, is for the court to place itself as nearly as possible in the situation of the testator at the time of the execution of the will."

Placing ourselves "as nearly as possible in the situation of the testator at the time of the execution of this will" before us, as such situation is disclosed by the extrinsic evidence in the case which can be properly

considered, we ask ourselves what was in the testator's mind—what did he mean by the words he uses? As said by Professor Graves in the paper referred to, and again quoted by Judge Kelly in delivering the opinion of the court in *Swan* v. *Swan's Ex'r*, 136 Va. 496, 117 S. E. 858:

" 'What is it that the judicial expositor seeks to ascertain—is it the meaning of the words or the meaning of the writer? The question is frequently put in this way, as if the disjunction were complete, and the answer must be either one way or the other. We answer, neither. Not the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer. It is not the meaning of the words in the abstract, for the meaning of the words varies with the circumstances under which they are used; and not the meaning of the writer apart from his words, for the question is one of interpretation, and what the writer meant to have said, but did not, is foreign to the inquiry; and *voluit sed non dixit* is the law's epitaph on a will which thus fails of its purpose. We must seek the meaning of the writer, but we must find it in his words; and we must seek the meaning of the words, but it must be the meaning of his words—of the words as he has used them—the meaning which they have "in the mouth of this party," to use the language of C. B. Eyre. *Gibson* v. *Minet*, 1 N. Bl. 615.' "

In the light of these rules, we ask again what was in the testator's mind? For one thing we can safely conclude that he had in mind a doubt as to the paternity of David Crockett Widgeon, born of his son Severn's unconventional marriage. This appears on the face of the will itself, as well as from extrinsic evidence, for he devises the remainder, after the life estate, in

the other clauses of the will, simply to "his" or "her
children," whereas, the devise in the fifth clause was
to "all children *lawfully* born unto him." It is also
manifest that the testator had in mind that Severn
might marry again and have children by said marriage.
Beyond this, so far as appears from the will and the
extrinsic evidence produced, we cannot go without
entering the realm of pure speculation and conjecture.
With these thoughts in mind, what did the testator
do? He devises the remainder after the death of his
son Severn, in terms broad enough to include David
Crockett Widgeon, the child already born to his son,
if he is really a lawful child, and also the lawful child
or children born to Severn if he should marry again.
He did not limit the devise to the children that might
be born of the second marriage if it should occur, nor
did he make provision for the disposition of the re-
mainder in case Severn should fail to remarry. It is
argued that the difference in the language used in the
devise of the remainder in the fifth clause of the will
from that employed in the other devises over shows a
purpose on the part of the testator, in the clause under
consideration, to exclude David Crockett Widgeon from
participation in the remainder devised by that clause.
We agree that quite a marked distinction exists in
the words used in these provisions, but when the
situation of the testator, as shown by the extrinsic
evidence, is taken into consideration, the reason for
this difference in language is easily accounted for,
and we think shows an intent just the opposite of
that contended for. In the fifth clause the testator
limits the remainder to the children "*lawfully* born"
which he does not do with reference to the remainder
in the other clauses of his will. The reason for this
distinction is apparent from the fact that testator

entertained a doubt in his mind whether David Crockett Widgeon was the lawful child of his son. The other distinction is, that in the fifth clause the testator expressly devised the remainder to "all" the lawfully born children of Severn. This word was not used in the other clauses of the will and we think carries with it much significance under the circumstances. If the testator meant to exclude him, even if he was lawfully born, why did he use the word "all"? He must have meant something by it, especially since he did not use it in the other clauses in referring to the children who were to take. If the will had read, "should he marry to all his children lawfully born of said marriage," the construction would have presented a different case, but if he meant anything by the use of the word "all" he must have meant those already lawfully born as well as those to be lawfully born. It was unnecessary to use this word in order to include the lawfully born children of the second marriage only, if he had so intended. To write in the will the words "his lawfully born children of *said marriage*" would be to write a will for him, which we cannot do.

If we are to speculate, is it not as reasonable, taking the words he used, to suppose that at the sunset of his life his feelings softened to this unfortunate grandson, that he thought he might have been unjust to him, and if he proved to be the lawful child of his son intended he should take his just patrimony, as it is to suppose that he intended to exclude him, when he did not, and could have done so by a word? He may have intended to exclude him; he may have meant to say so; but since he did not, in the words of Professor Graves, we can only inscribe "the law's epitaph, *voluit sed non dixit* upon a will which thus fails of its purpose."

It is a well settled rule of construction that the intention of the testator must be derived from what the testator has actually said, and not from what it may be supposed he intended to say.   *Swan* v. *Swan's Ex'r, supra; Wootton* v. *Redd's Ex'r*, 12 Gratt. (53 Va.) 196; *Burke* v. *Lee*, 76 Va. 386.

"It is also well settled that while it is true that in the construction of wills the intention of the testator, if not inconsistent, must be found in the language of the testator used in the will; in the meaning of the words used by the testator, when properly interpreted, rather than his *presumed or supposed* intention." *Hurt* v. *Hurt*, 121 Va. 413, 93 S. E. 672.

It might also be added that it is conceded that David Crockett Widgeon takes the remainder after his father's life estate under the ninth clause of the will of Thomas Widgeon.   Counsel for plaintiff in error are unable to explain the implication to be drawn from this provision of the will—that the testator did not intend to exclude him from a share in his estate—except upon the ground that the property devised by that clause is much less in value than the property devised by the clause under interpretation. Since the appellants' case is based principally upon the contention that the testator did not intend to recognize David Crockett Widgeon in his will, on account of the circumstances attending his birth, we fail to see any force in this argument.   If testator intended to exclude him on that ground there does not appear to be any more reason for recognizing him in one instance than in the other.

In other words, if the testator intended to devise the remainder after his father's life estate under the ninth clause, the reasons assigned in argument for testator's intention to exclude him from any interest

in the remainder devised under the fifth clause would seem to fall to the ground, certainly in the absence of any language employed by the testator in the latter clause to show a contrary intent. On the whole, it seems to us that the only condition prescribed by the fifth clause of testator's will is that David Crockett Widgeon shall be the lawful son of Severn Widgeon, and it being admitted that he fulfills that condition, he is entitled to take the remainder devised by that clause.

If, perchance, the result in this case is not in accord with the testator's actual intention, yet we think we can justly say that the fault lies with the testator rather than with the expositor. We are of the opinion that the decree of the circuit court should be affirmed.

*Affirmed.*

McLEMORE, J., dissenting:

Testator, Thomas Widgeon, who was an illiterate man, executed a will in which he provided for seven children, with reference to six of whom he concludes the devise in each case with this language, "and at his (or her) death I give and devise this property to his (or her) children." The devises are all copied at length in the majority opinion.

His son, Severn, early in life formed an unfortunate alliance, and was married in consequence thereof, soon after which a child, David Crockett Widgeon, was born. The parents never lived together, and in 1896, three years after the enforced marriage, a divorce was granted the wife, in the prosecution of which testator had been actively interested, and had, both before and after the divorce, refused to recognize David Crockett, the issue of the marriage, as his grandson.

When he came to provide in his will for the son, Severn, he made a radical change in the language, as compared with that employed in respect to the other six children. Severn was now divorced and his wife married to another.

The clause in question reads as follows:

"5th. I loan to my son Severn the farm where I now live commencing at the railing on the west side of the yard where Geo. Gregory now lives and running south to the land of M. T. Wilson except the house and lot where John Widgeon now lives the store house and house and lot where F. L. Holland now lives during his natural life and should he marry I give and devise this property to all children lawfully borned unto him. The remainder of this farm I will hereinafter devise."

It will be observed that while testator in every other instance of a devise to his children disposed of the fee by this fixèd phrase, "and at his death I give and devise this property to his children;" in the case of Severn there is substituted these significant words, "and should he marry I give and devise this property to all children lawfully born*ed* unto him." That he was not referring to the enforced marriage is conceded, for the will was written some eight years after that event. If he intended to include the child of this marriage, why the change in the language from that employed in respect to all the other devises? If it was not his intention to ignore the first marriage and its fruitage, why make the fee depend upon his marriage at some future date after the will was written? What possible reason could the testator have for giving this disowned grandchild property worth some $30,000, *provided Severn should thereafter marry, and make no provision for him if the father failed to enter into a second*

*matrimonial venture?* To ask these questions is to answer them. Decedent had in mind children of the future marriage, and realized that to make the same provision for Severn as was used in the devises to his other children would include David Crockett Widgeon, which I think he very clearly did not want to do, and thus the change in the language of the fifth paragraph. This conclusion seems irresistible when it is recalled that Jeff Widgeon, a brother of Severn, had been married, had three children and lost his wife before testator's death, presenting exactly the same situation and possibility of a second marriage with children as obtained in the case of Severn, but without any change in the devise in the will to Jeff, or any reference to a second marriage.

The opinion of the majority in this case gives exactly the same effect to the language contained in the fifth clause as is given to the unconditional devise of the fee in the clauses to the other children. This seems to do violence to the plain intention of the testator, and for that reason I dissent.

I have not referred to the general principles of construction as applied to testamentary dispositions, for they are too well recognized to require restatement.

HOLT, J., concurs.