**Daisy B. STONE, Plaintiff,**

v.

**Edley Craighill Nicholas STONE and Richard Fielding Stone, III, Defendants.**

**Civ. A. No. 68–C–11–L.**

United States District Court,
W. D. Virginia,
Lynchburg Division.

Aug. 23, 1971.

Richard F. Stone, Lynchburg, Va., for plaintiff.

William Rosenberger, Jr., Lynchburg, Va., for defendants.

## OPINION

WIDENER, Chief Judge.

This case has been the subject of a previous opinion of this court as to its jurisdiction dated May 15, 1968 (not published) and of the Fourth Circuit, published as Stone v. Stone, 405 F.2d 94 (1968).

This court, in the trial of the case, it not having been before heard on the merits, heard the evidence *ore tenus* without a jury at two separate sittings, aggregating four days. The deposition of one witness was filed in addition to the evidence in open court.

The persons involved in the case and their ages (where given) at the time of the trial are Daisy Stone, age 92, the mother of Richard F. Stone, Jr., whose ex-wife is Edley Craighill Nicholas Stone. The grandchildren of Daisy Stone and children of Richard F. Stone, Jr. and Edley Craighill Nicholas Stone are Edley Craighill Stone, age 27, born August 26, 1942, and Richard F. Stone, III, age 22, born December 2, 1946. Because all of the parties have a common surname and two pairs of them have common first names, with no hint of familiarity, they will be referred to as Daisy, Richard, Jr., Richard, III, Edley, Sr., and Edley, Jr.

Richard, Jr. and Edley, Sr. were twice divorced from the bonds of the same marriage, once in the Virgin Islands and once in Lynchburg. Both divorces were granted in 1964. Probably on account of the divorces or on account of the family infighting which led to the divorces, Richard, Jr., Richard, III, Edley, Sr., and Edley, Jr., are extremely embittered, the mother and the two children siding against the father. Without in any way getting involved in the merits of the marital difficulties, the court is of opinion that the bitter feelings above mentioned had a distinct bearing on the testimony of all these four witnesses. No other reason is apparent from the record. The court heard Richard, Jr., Richard, III, and Edley, Sr., orally, in open court, and observed their demeanor and manner while on the stand. The court has read the deposition of Edley, Jr., offered in evidence by the defendants, and it reflects the same bitter feelings shown openly by the other three members of Richard, Jr.'s family. For example: She did not send a wedding invitation to Daisy. It was almost impossible to get a direct, responsive answer out of Richard, Jr., Richard, III, Edley, Sr., or Edley, Jr. All of them testified on both sides of many facts about which they were questioned, and only their occasional admission is of much value to the court. The court advised the three whose evidence was heard *ore tenus*, in open court, at the conclusion of the trial, " * * * under those conditions, the testimony of the three of you I don't think does me much good at all." Having read the transcribed evidence twice since the trial, the court remains of this opinion, and adds that the deposition of Edley, Jr., should be included with the evidence of Richard, Jr., Richard, III, and Edley, Sr., insofar as its probative value is concerned.

To the contrary is the testimony of Daisy, who was 92 years old at the time of the trial. This remarkable woman was on the witness stand for an entire day, and despite her advanced years and

the fact that she is bound to have been quite emotionally involved in the case, her testimony was clear and lucid, considering her age and the time elapsed, and was the only evidence in the case from a member of the immediate family in which the court has confidence. The court has compared the credibility of the witnesses and believes Daisy.

In addition to those immediately affected by the proceeding, a sister of Edley, Sr., testified, as did a former employer of Richard, Jr., the employer's wife, a bank official, the husband of a former secretary of Richard, Jr., and a recruiting sergeant.

Daisy sues Richard, III in order to recover from Richard III certain Esso and Texaco stock, or its value, which stock is in the possession of Richard, Jr., but in the name of Richard, III, and which she alleges was in trust for the education of Richard, III, but which he refuses to return to her, the trust having terminated. She also sues Edley, Sr., for conspiring with Richard, III in his refusal to sign over to her the Esso and Texaco stock. The total amount sued for in this facet of the suit is less than $10,000. Daisy also sues Edley, Sr., for conspiring with Edley, Jr., in Edley, Jr.'s conversion to her own purposes of Texaco stock, which Daisy claims was in a similar trust. The Texaco stock in the hands of Edley, Jr., is valued at less than $10,000. The total amount of stock involved exceeds $10,000.

At all times, for the purposes of diversity in this suit, it should be considered that Daisy is a resident of California, Edley, Sr., and Richard, III residents of Virginia, and Edley, Jr., a resident of Tennessee. Edley, Jr., is not here sued, quite probably because, being a resident of Tennessee, process from this court will not reach her.

Probably in the late 1940's, just prior to moving from Pennsylvania to California, Daisy saw a play in New York entitled *Mama's Bank Account*. What the play is actually about is of little mo-

ment, but it put the idea in Daisy's head of providing for a college education for her grandchildren. Commencing on September 21, 1951, with a transfer of 22 shares of Esso stock to the name of Richard, III, who was then four years of age, and continuing at least until January 6, 1964, Daisy, from time to time, transferred to the names of Edley, Jr., and Richard, III various lots of stocks and bonds of Axe-Houghton Fund, Standard Oil Company of California (referred to throughout this opinion as Esso), West Shore Railroad, Armco Steel, Texaco, Aetna Insurance Company, and Commonwealth Investment Company. On none of the stock certificates issued in the names of the children as a result of any of the transfers was there any mention of the word *trustee*. There may be an inference from the testimony and exhibits that the Armco Steel stock may have been so designated on transfer from Daisy, but the filed stipulation of the parties is to the contrary, and the court accepts the stipulation.[A1] The record of the transfers shows that they were obviously at random, and the court believes Daisy when she testified that the transfers were made when she could afford them.

Although the transfers, on their faces, were in the names of the Stone children, Daisy has testified that the transfers were, in fact, in trust for the education of the Stone children. Daisy had set up similar funds for the education of the children of her daughter, Marjorie Reller, but most or all of the transfers for the benefit of the Reller Children were in the name of the Reller parents rather than the children.

Daisy stated that the reason she did not make the transfers in the names of the Stone parents, or of Richard, Jr., was because she did not want the stock to be in the position where it could be considered a part of the estate of Richard, Jr., and having seen and heard the witnesses testify, the court understands her position in this.

A1. See note 4.

Although the divorce between Richard, Jr., and Edley, Sr., took place in 1964, trouble had obviously been brewing between them for a number of years before that, and, for some reason never fully explained to the court, a family coolness developed through the years, which the grandchildren blame on Richard, Jr.

In this setting, Daisy continued to make the transfers of stocks and bonds in the names of the children, with the understanding that they would be held in trust for the children's education. She expressed no wish as to what would happen to any of the funds which might be left over, stating that she didn't give the matter any thought, her only worry being that there would be enough to educate them. She testified, and this is corroborated by the testimony of Edley, Sr., that she had been advised by her attorney (Richard, Jr.) not to place the stock in the name of minor children but to have a trustee, but she did not want this. She wanted Richard, Jr., to be the trustee. The children were to go to the schools of their choice, subject to the approval of Richard, Jr., and herself. Daisy was to have the last say. Through the years, the children were to have the use of the dividends and interest from the stocks and bonds.

As the various stocks and bonds came in, most of them were addressed to the children in their proper names only, but a few came in care of Richard, Jr. Through the years, there were numbers of stock dividends and stock splits and dozens of receipts of stock certificates and bonds by the Stone children. All of these certificates were uniformly given to Richard, Jr., and placed in his safe deposit box at the bank at the time they were received, with the exception of one

Texaco certificate, which remained in the hands of Edley, Jr. (this later had a stock dividend issued upon it and then split), and one Axe-Houghton certificate which remained in the hands of Richard, III. One share of Esso also remained in the hands of Richard, III, the result of the purchase of a fractional share as a result of a stock dividend.[1]

Some fifteen months after the *ore tenus* hearing, the attorneys filed a 26-page stipulation showing the various stock transactions and a part of the bank account transactions involved in the case.

Edley, Jr., was born in 1942 and graduated from high school in 1960. Richard, III was born in 1946 and graduated from high school in 1965. None of the stocks or bonds involved was sold until May 16, 1960,[2] when 100 shares of Commonwealth Investment were sold, which was all applied to Edley, Jr.'s college education. $200 of the sales price was sent to the college; $200 was put in her personal checking account; and the balance was put in a savings account of Richard, Jr., as trustee for Edley, Jr. Deposits were made into this savings account from the sale of Texaco stock in 1962, 1963, and 1964, and withdrawals were made from time to time from this savings account, all of which was used by Edley, Jr., for her education. A checking account was also opened in the name of Richard, Jr., as trustee for Edley, Jr., in 1964, from which various withdrawals were made to Edley, Jr., personally, for her education, during 1964. Edley, Jr., graduated from the University of Tennessee in 1964, having previously attended Mary Washington College and Marion College. Parenthetically, it should be said that a great deal of family discussion always accompanied

---

1. Daisy does not sue for the conversion of the Axe-Houghton by Richard, III, which amounted only to $121.32. The same applies to the one share of Esso sold for $58.92.

2. 15 Shares of Aetna and a West Shore Railroad bond, both a part of the Edley, Jr., trust, were sold in 1959 to pay off

a note of Edley, Sr. Daisy sought to amend to sue for this just prior to the trial, which amendment was not allowed. Although the matter, strictly speaking, is not before the court, the record shows that Richard, Jr., and Edley, Sr., collaborated in the sale.

the entrance or attempted entrance of both children into various schools, the children and Edley, Sr., seldom agreeing with Richard, Jr., and Daisy as to where the children should go. Richard, Jr., and Daisy had the say-so, and the children acquiesced at least as far as through the first year in college of Richard, III. After Edley, Jr.'s graduation from college, the remaining funds in the two bank accounts for her were transferred into a savings account which had been maintained since 1954 in the name of Richard, III by Richard, Jr.

Into this savings account, at the First and Merchants Bank, went various small deposits, including interest on the account and some dividends from the stocks, as well as the sale of a West Shore bond, Axe-Houghton and Esso stock on December 31, 1965. With negligible exceptions, all withdrawals from this savings account, commencing September 10, 1965 and continuing through March 3, 1966, were made by transfers to the account of Richard, Jr., trustee for Richard, III.

A savings account styled Richard, Jr., trustee for Richard, III, was opened March 3, 1966 at Fidelity National Bank, and deposited into the account were transfers from other accounts maintained for the educational fund of Richard, III, interest on the account, and a few dividends. All withdrawals from the account went to a checking account styled Richard, Jr., trustee for Richard, III, at Fidelity National Bank, except on March 6, 1967, Richard, III, having insisted on attending Lynchburg College against the expressed wishes of Richard, Jr., and Daisy, Daisy effectively took the position that the trust was at an end, and had returned to her $5,100 and, at her direction, Richard, Jr., was paid $300 which he said covered his expenses.[3] Later, deposits of interest on the account and dividends were transferred to the account of Richard, Jr.,

trustee for Richard, III, in 1968, and presumably returned to Daisy.

The checking account at Fidelity National Bank was opened March 3, 1966 in the name of Richard, Jr., trustee for Richard, III, into which were deposited funds from the transfer of other accounts maintained for the educational fund for Richard, III, some dividends, and interest on the account. The withdrawals from the account were solely for the education of Richard, III, or to other accounts maintained by Richard, Jr., trustee for Richard, III on account of the educational fund. A similar checking account, opened September 10, 1965, was maintained at First and Merchants Bank in the name of Richard, Jr., trustee for Richard, III.

Much is made by the defendants in the case of the fact that nowhere does the name of Richard, Jr., as trustee appear until 1960. The court is unimpressed by this argument. Certainly the plaintiff's case would be stronger if Richard, Jr.'s name as trustee for one child or the other had appeared on all the stock certificates and on the one bank account (not as trustee) which he maintained for his son, but in such event, of course, this case would never have been tried in its present setting.

Much is also made throughout the defensive pleadings and attenuated proof of the claim that the certificates were deposited in a "family" safe deposit box. The court finds as a fact that there was no "family" safe deposit box and that the only safe deposit box involved in this action was one maintained in the name of Richard, Jr. Edley, Sr., undoubtedly had access to the box on at least one occasion, and the bank's records concerning this access, which was in or before 1959, are lost.

There was never any doubt in Daisy's mind throughout this whole transaction that the stocks which she was sending from California to Virginia in the names of the infant children were in

---

3. As shown by the stipulation. Plaintiff's exhibits show the payments to Daisy and Richard, Jr., were made from the Fidelity checking account.

trust solely for their education and for no other purpose. Since the certificates were physically in the hands of her son, whom she considered to be her trustee, they were beyond the reach of the children, and in all ordinary circumstances she would have been assured that the purpose for which the stocks and bonds were transferred would have been as fully carried out by this method as if there had been a formal trust agreement with a named trustee.

On February 1, 1967, Daisy, in consultation with Richard, Jr., reduced her previous thoughts concerning a trust to writing, and, for the first time, included a clause concerning its revocation. The defendants objected to the admission of the trust agreement on the ground that, on its face, it applied only to transfers of stock taking place in the future, which objection, taken in its narrow context, of course, is good. The agreement, however, is admissible as a prior consistent statement, the defendants having sought at length, but largely unsuccessfully, by way of cross examination, as well as by testimony and depositions, to show prior inconsistent statements on the part of Daisy. United States v. Leggett, 312 F.2d 566 (4th Cir. 1962). The written trust agreement is therefore admissible as going to the weight of Daisy's evidence.

The court does not, in its order entered in this case, enforce the written trust agreement; however, it does enforce the parol trust in personalty created by the transfer of the stocks and bonds in the names of the children, in the physical custody of their father, for the sole purpose of their education and for no other purpose.

Although Richard, III was eligible for readmission to the University of Tennessee in the fall of 1966 for his second year, he chose to attend Lynchburg College, over the opposition of Daisy and Richard, Jr. Richard, Jr. and Daisy would not allow the educational fund to be used to attend Lynchburg College. Following this, Daisy wrote a letter revoking the trust, and she demanded her stock returned. The money remaining had been previously transferred to Daisy, and Richard, III was told about this at the time of the transfer. He refused to sign over to Daisy the stock certificates in his name, although he had signed over to her, on September 16, 1966, 17 shares of Armco Steel,[4] obviously in the possession of Richard, Jr., as had been the other stock certificates with the minor exceptions above noted.

Prior to this time, in the Corporation Court of the City of Lynchburg, Edley, Sr., on behalf of Richard, III, had sued Richard, Jr., for the possession of the stock certificates in his possession which were in the name of Richard, III. The case was dismissed because Richard, III was 21 years old and entitled to maintain his own case. Richard, III has filed no counterclaim here against Daisy on account of the sum of more than $5,000 which was returned to her following his refusal to attend school other than at Lynchburg College. The court considers it quite significant that although more than $5,000 was returned to Daisy from the educational fund of Richard, III, admittedly against his wishes, he has filed no counter-claim against Daisy in this proceeding. Arising out of the same transaction which is the subject matter of Daisy's claim, this is a compulsory counter-claim under F. R.Civ.P. Rule 13, and certainly the parties to this case cannot be said to shy away from litigation.

In the view of the court, the questionable aspects of this case almost wholly are concerned with matters of fact. The law in Virginia is settled on the two principal issues of the case, which follow:

First: May a parol trust in personalty be established, and, if so, what evidence is required to sustain it?

4. Whether the Armco Steel was signed over by Richard, III, or Richard, Jr., trustee for Richard, III, would make no difference in this decision.

Second: If such a trust has been established, with no disposition of the corpus provided for when its purpose is ended, what disposition should then be made of the corpus?

It has been settled law in Virginia for years that a trust may be created and established by parol. Young v. Holland, 117 Va. 433, 84 S.E. 637 (1915); Fleenor v. Hensley, 121 Va. 367, 93 S.E. 582 (1917); Hook v. Hook, 126 Va. 249, 101 S.E. 223 (1919); Russell's Executors v. Passmore, 127 Va. 475, 103 S.E. 652 (1920); Brame v. Read, 136 Va. 219, 118 S.E. 117 (1923); Hunter v. Bane, 153 Va. 165, 149 S.E. 467 (1929); Jackson v. Greenhow, 155 Va. 758, 156 S.E. 377 (1931); Ingles v. Greear, 181 Va. 838, 840, 27 S.E.2d 222 (1943); Darden v. Darden, 152 F.2d 208 (4th Cir. 1945).

The rule of evidence which must be followed is that before the person seeking to establish such a trust may prevail, the burden is upon him to establish by explicit, clear, and convincing evidence that the declaration of trust relied upon is unequivocal. *Ingles*, 181 Va. at page 840, 27 S.E.2d at page 223; *Darden*, 152 F.2d at p. 209.

The law is also clear that when the purpose of a trust has been accomplished or has failed, and no disposition of the remaining corpus is provided for, there is a resulting trust in favor of, or the title reverts to, the settlor. 4 Scott on Trusts, 2nd Ed., §§ 411, 412, 422A, 430. See Peal v. Luther, 199 Va. 35, 36, 97 S.E.2d 668, 669 (1957); Russell's Executors v. Passmore, 127 Va. 475, 501, 103 S.E. 652, 660 (1920), and Sims v. Sims, 94 Va. 580, 584, 27 S.E. 436, 437 (1897).

Another principle of law which is involved concerns the transfer of a stock certificate into a person's name without qualification on the face of the certificate. Such a transfer constitutes the transferee named in the new certificate *prima facie* the real owner. In the absence of proof to the contrary, the named transferee may successfully stand on his right to the stock against attacks from any source. In the case of Swan v. Swan's Executor, 136 Va. 496, 117 S.E. 858 (1923), the reason for the named transferee being only *prima facie* the real owner is stated:

"But it is quite possible and often happens, for reasons of convenience or otherwise, that stock held in the name of one person really belongs to another. * * * Sometimes the transferee is merely a nominal holder or 'dummy,' and in that event, although the transfer may be perfectly regular and complete on its face, the true ownership remains in the transferor, and that fact may be shown." 136 Va. 496, 519, 117 S.E. 858, 865.

Applying the above principles to this case, the court is convinced and finds as a fact, by clear, convincing, and explicit evidence, largely given by Daisy Stone but corroborated by almost every act of Edley, Sr., Edley, Jr., Richard, Jr., and Richard, III, that the transfer of the stock in question in this case into the names of the infant children, Edley, Jr., and Richard, III, was a conveyance in trust for their education and for no other purpose. They were to use the dividends and interest from the stocks and bonds, which they did, except in some instances in which Richard, Jr., took the dividends from Richard, III, for which he deserves no approbation whatsoever. The purpose of the trust as to Edley, Jr., was accomplished when she graduated from the University of Tennessee, and this is corroborated by the fact that the funds remaining in the bank account, kept for the benefit of her education, were transferred into the bank accounts kept for the education of Richard, III. The record does not show she has ever complained about this transfer.

The purpose of the trust established for the education of Richard, III was accomplished or terminated, or the trust failed, the difference here is not material, at the time he insisted on attending Lynchburg College against the wishes of Richard, Jr., and Daisy. After that

time, Daisy had the right to the return of the unexpended corpus to her. Richard, III did, in fact, return to Daisy 17 shares of Armco Steel,[5] and funds in cash in excess of $5,000 were returned to Daisy from the accounts maintained by Richard, Jr., as trustee for Richard, III. Although Richard, III, later in his testimony, claimed he had no knowledge of the return of the cash, he initially admitted that he did, and the fact that he has not and does not make any complaint or filed any counter-claim about this, the court considers significant. The initial denial of Richard, III, in his testimony, that he never had any idea of the purpose for which the transfers of the stocks and bonds were made is incredible, because the entire family, including Edley, Sr., Edley, Jr., and Edley, Sr.'s sister freely admitted knowing of the purpose. Other than such admissions as Richard, III may have made in his testimony, the court gives his testimony little or no weight whatsoever.

The defendants have pleaded to the jurisdiction of the court in that the jurisdictional amount, they say, is not as much as $10,000. The principles to be applied to this plea have been settled in the previous appeal in this action as above cited.

■ In the opinion of the court, the claim of Daisy against Edley, Sr., that Edley, Sr., conspired with Richard, III and Edley, Jr., not to return to her the stock which had a total value admittedly of more than $10,000 is a single constitutional case, and being such, the court is of opinion that its jurisdiction ought to be sustained. Gibbs v. U.M.W., 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), Stone v. Stone, 405 F.2d p. 98.

■ In order to sustain the claim on its merits, however, against Edley, Sr., the burden is upon the plaintiff to prove her case by a preponderance of the evidence as in any other civil action. Although there are facts and circumstances from which a trier of fact could find

that Edley, Sr., conspired with her children to do the acts charged, the court is of opinion that the plaintiff has not proved this aspect of her claim by a preponderance of the evidence, and judgment will not be entered against Edley, Sr., in this action.

The court particularly notes that Edley, Jr., was more than 21 years of age when she borrowed money on the Texaco stock in her possession and, by so doing, effectively converted it to her own property. The principal claim of the plaintiff is that Edley, Sr., took the Edley, Jr., Texaco stock out of the safety deposit box at the bank. This claim is refuted by the documentary evidence of the bank that no one had been in the safety deposit box since 1960 except Richard, Jr. The 91 share Texaco certificate was issued in 1961, and the 4 share certificate later pledged was issued in 1964. Similarly, although there are facts and circumstances from which a trier of fact might find that Edley, Sr., conspired with Richard, III not to return the Esso and Texaco stock to his grandmother, the court is of opinion that such has not been proved by a preponderance of the evidence. There is just not enough positive evidence, in the opinion of the court, upon which to base a finding of fact to the effect that Edley, Sr., was in league with Richard, III in his actions taken with respect to the stock which should be returned to Daisy. That Edley, Sr., is in sympathy with the acts of her children is apparent, but this is not enough upon which to base a judgment.

An order is this day entered requiring Richard, III to sign over to his grandmother, Daisy B. Stone, all of the Esso and Texaco stock in his name which is here involved. The court being advised by the attorneys that there has been no dividend distribution since the institution of this suit, and the stipulation showing that dividends paid on these stocks between September 1966 and the institution of this suit were put into the

---

5. See note 4.

■

educational fund by Richard, Jr., no accounting for dividends is ordered.

Daisy will recover her taxable costs from Richard, III, and Edley, Sr., will bear her own taxable costs. The costs here referred to are costs accruing since the remand of this case from the Fourth Circuit.

The order effectively preventing the transfer of Edley, Jr.'s Texaco stock will be vacated.

This opinion is findings of fact and conclusions of law in accordance with Rule 52, F.R.Civ.P.